## Case No. 7,259.

Ex parte JENKINS et al. (three cases).

[2 Wall. Jr. 521;[1] 2 Am. Law Reg. 144; 1 Phila. 451; 10 Leg. Int. 166.]

Circuit Court, E. D. Pennsylvania. Oct. 15, 1853.

---

[1] [Reported by John William Wallace, Jr., Esq.]

GRIER, Circuit Justice. The jurisdiction of the courts of the United States is limited, but within its limits supreme. The state courts have often in many cases, a concurrent jurisdiction over the same subjects and persons. But neither can treat the other as an inferior jurisdiction, except in the cases where the constitution and acts of congress have given such power to the courts of the Union. Where persons or property are liable to seizure or arrest by the process of both, that which first attached should have the preference. Any attempt of either to take them from the legal custody of the officers of the other, would be an unjustifiable exercise of its power, and lead to most deplorable consequences. Therefore, if a person be imprisoned under the civil or criminal proofs of one, the other cannot take him from such custody in order to subject him to punishment for an offence against them. A fugitive cannot be taken from the legal custody of the sheriff by any warrant from the courts of the United States, in order to extradition, under the acts of congress. Neither can such fugitive, when in custody of the marshal, under legal process from a judge or commissioner of the United States, be delivered from such custody by means of a habeas corpus or any other proofs, to answer for an offence against the state, whether felony or misdemeanor, or for any other purpose.

While the act of congress does not forbid the issuing of a habeas corpus by a state judge, it carefully guards against the abuse of it, and makes a certificate of a commissioner or judge of the United States, "conclusive evidence of the right of the person

or persons in whose favour it is granted, to remove such fugitive;" and forbids "all molestation of such person or persons by any process issued by any court, judge, magistrate, or other person whomsoever." This act of congress is the supreme law of the land, and binding on the conscience of state judges as well as those of the United States. Judges of the United States, as well as of state courts, are therefore bound to dismiss a writ of habeas corpus, or to refuse to allow it whenever they are properly informed that the prisoner is held by legal process under this act, and not to suffer it to be abused by mischievous intermeddlers for the purpose of "molestation" of the officer or owner of the fugitive in effecting his extradition.

The laws of the United States give ample remedy by habeas corpus for those illegally imprisoned under colour of their process—and state courts have in many instances exercised a concurrent jurisdiction in similar cases. But state courts or judges have no power under a habeas corpus to review or sit in error upon the judgments or process of the judicial officers of the United States acting within the jurisdiction committed to them, as has sometimes been done.

Passing, however, from these observations of a general kind to the principles which apply to the case immediately before us.

The counsel whom we heard as amicus curiae, suggested to us—quoting the judiciary act of 24th of September, 1789 (section 14), as his argument—that the court had no power to discharge the prisoner, because he was held by a warrant from the state magistrate for an alleged criminal offence against the state of Pennsylvania; and that the warrant was conclusive evidence of the fact. To a habeas corpus issued by this court under the authority conferred on them by the judiciary act, this objection would be conclusive. But this writ was not allowed and issued under the general law, but as the district-attorney of the United States has stated, under special powers conferred by the act of congress of 2nd March, 1833 (chapter 57, § 7), which, so far as material to our present inquiry, is as follows:

"And be it further enacted, that either of the justices of the supreme court, or a judge of any district court of the United States, in addition to the authority already conferred by law, shall have power to grant writs of habeas corpus in all cases of a prisoner or prisoners in jail or confinement, where he or they shall be committed or confined on, or by any authority of law, for any act done or omitted to be done in pursuance of a law of the United States, or any order, process or decree of any judge or court thereof, any thing in any act of congress to the contrary notwithstanding."

The petition states, and the proof shows, that the prisoner has been committed for an act done in executing process issued in pursuance of a law of the United States. It therefore comes within the provisions of this act.

What then have we power to do on the return of the writ? "The writ of habeas corpus is a high prerogative writ known to the common law: the great object of which is the liberation of those who may be imprisoned without sufficient cause. It is in the nature of a writ of error, to examine the legality of the commitment; it brings the body of the prisoner up, together with the cause of his commitment. The court can, undoubtedly, inquire into the sufficiency of that cause." Ex parte Watkins, 3 Pet. [28 U. S.] 201.

A warrant of arrest issued by a justice of the peace has none of the characteristics of a judgment of a court of record, and is therefore not conclusive evidence that the prisoner is rightly deprived of his liberty. It is every day's practice to inquire into its regularity, and whether it has been issued on sufficient grounds to justify the arrest and imprisonment. If this could not be done, the writ of habeas corpus would little deserve the eulogies which it has received as a protection to the liberty of the citizen.

Warrants of arrest issued on the application of private informers, may show on their face a primâ facie charge sufficient to give jurisdiction to the justice; but it may be founded on mistake, ignorance, malice, or perjury. To put a case very similar to the present, A. tells B. that he has seen C. kill D. B. runs off to a justice, swears to the murder boldly, without any knowledge of the fact, and takes out a warrant for C., who is arrested and imprisoned in consequence thereof. C. prays a habeas corpus, and shows that he was the sheriff of the county, and hanged D. in pursuance of a legal warrant. If a court could not discharge a prisoner in such a case, because the warrant was regular on its face, the writ of habeas corpus is of little use. Every arrest of the person is an assault and battery, and attended with force and violence against a resisting party; and if made by three or more persons is a riot, provided the fact be concealed that it was made in execution of a legal warrant.

The authority conferred on the judges of the United States by this act of congress, gives them all the power that any other court could exercise under the writ of habeas corpus, or gives them none at all. If under such a writ they may not discharge their officer when imprisoned "by any authority," for an act done in pursuance of a law of the United States, it would be impossible to discover for what useful purpose the act was passed. Is the prisoner to be brought before them only that they may acknowledge their utter impotence to protect him? This act was passed when a certain state of this Union had threatened to nullify acts of congress, and to treat those as criminals,

who should attempt to execute them; and it was intended as a remedy against such state legislation. If the state of Pennsylvania had, by act of legislature, declared that the fugitive law should not be executed within her borders, and had directed her officers to arrest and imprison those of the United States who should attempt to execute it, would not this court have been bound to treat such act as unconstitutional and void, and discharge their officers from imprisonment under it? And have they no power to do so, when intermeddlers endeavour to abuse state process for the same purpose? If the marshal and his officers. may be arrested for serving process, why not the commissioner and judge who issued the process? The extreme advocate of state rights would scarcely contend that in such cases the courts of the United States should be wholly unable to protect themselves or their officers.

Let us look at the consequences. While the marshal's officer in this case is endeavouring to take the prisoner. a person swears to the information on which this warrant was issued, and puts it, we will suppose, into the hands of the sheriff. knowing the person charged to be acting under authority of the laws of the United States. Now, let us suppose the marshal's officers had succeeded in making the arrest, and the sheriff had attempted to execute process, what would have been the consequence? If the marshal resists, a contest ensues, which may be called, in fact, a war between officers, each acting and justifying his conduct under proof from his particular sovereign. If the sheriff succeeds, the fugitive is discharged and the officer of the United States conveyed to prison. If such a state of affairs can be brought about at the instance of any person, who is willing to swear without scruple to that which he does not know to be true. or perhaps knows to be false; then, indeed, has been discovered a safe mode of nullifying the constitution and laws of the United States.

In conclusion, as we find that the prisoners are officers of the United States, in confinement for acts done in pursuance of a law of the United States, and under process from a judge of the same; that they have not exceeded the exigency of the process under which they acted; that this prosecution has not been instituted, nor is now acknowledged by the state of Pennsylvania, but has its origin in some association living at a distance. and ignorant of the transaction which they have volunteered to investigate; that the information on which the warrant to arrest the prisoner is founded, was sworn to by one who did not know whether the matter of the affidavit was true or false. and that by stating but half the truth, it is wholly false. Therefore the order of the court is, that the prisoner be discharged.

## The Second Case.

Some time after the prisoners were thus discharged, the negro, Thomas, brought a civil suit in the supreme court of Pennsylvania against Jenkins, Wynkoop, Crossin and Keith, the same deputy marshals. The negro, himself, filed no affidavit of his cause of action, but there were two affidavits filed by other persons. They showed, that on the day of the attempted arrest of the fugitive, Thomas, he came out from a hotel in Wilkesbarre. wounded. bleeding and faint —that he was pursued—that there was a cry of "Shoot him," and the sound of pistol shots —that he made his way to the river, and plunged in, declaring "that he would never be taken,"—that he subsequently came out, but was driven back again to the water's edge, by a presented pistol—that there were many persons on the river bank, some of whom were menacing, and some who are spoken of as the "pursuers" and "the officers;" that among the persons on the bank were three, of whom one witness says he "saw two in the court room—one was Wynkoop, and the other. a big man," he thinks "Crossin,"—and that "soon after the return of the officers to the hotel." the fugitive having gone away in the meanwhile. unrestrained, a colloquy of an excited character took place between two gentlemen at the hotel. in which one of them announced himself as "Judge Collins," and the other as "John Jenkins, U. S. deputy-marshal." Nothing. whatever, was said in them about Keith, the fourth party now arrested. However, on these affidavits. a judge of the supreme court of Pennsylvania allowed a capias ad respondendum in trespass, vi et armis, and with bail in the sum of $5000 specially allowed, to issue, and under this writ, all four officers were arrested by the sheriff of Philadelphia county, and not giving bail, committed to prison. In a suit of the United States, at their relation, against Allen. the sheriff. they now presented their petition for a habeas corpus, setting forth that they were deputy marshals of the United States; that as such. they were charged by a writ duly issued by a commissioner of this court. and indorsed in proper form, with the duty of arresting Thomas. as a fugitive from labour; that having found him, they sought to arrest him, but by great violence were prevented from doing so—setting forth the fact of the capias ad respondendum. &c., and averring that all their acts and doings were done by them as officers of the United States, in pursuance of a law of the United States, and of process issued by a court thereof. The relators having made out a prima facie case in accordance with their petition, Thomas's counsel presented the affidavits on which the judge of the supreme court had ordered them to be held to bail. The relators then offered evidence in rebuttal. to which the other side objected, on the

ground that the case must rest upon the facts which were before the state judge, when he fixed the bail.

After argument on both sides, the opinion of the court (GRIER, Circuit Justice, being absent) was delivered in substance as follows:

KANE, District Judge. The seventh section of the act of congress of March 2, 1833, c. 57 [4 Stat. 634], under which the action of the court in the present instance is to be regulated, enacts, "that either of the justices of the supreme court or a judge of the district court, shall have power to grant writs of habeas corpus in all cases of prisoners in confinement, where they shall be confined by any authority of law for any act done in pursuance of a law of the United States, or any process of a judge or court thereof."

I will not weaken, by a repetition, that clear and conclusive exposition of this section, given by Judge GRIER, when this case was before us on the arrest, at the suit of the commonwealth, for the assault and battery with intent to kill. But to say that we may issue a habeas corpus to rescue an officer from imprisonment for doing his duty, and yet that we shall shut our eyes to the proofs that he did it—to affirm that a court, called on to inquire whether an imprisonment is tortious, must listen to no evidence but that of the tort feasor himself and his accomplices—to protest that wrong is to be done by truth pertinent to the issue—is to invert the first principles of common sense as well as justice.

What is that issue? Is it whether the learned judge of the supreme court of Pennsylvania had authority to issue this writ: or whether this writ itself is formal? No one has contested either of these positions. Is it whether he has exercised his functions properly? It is no part of my functions to revise his adjudications; he has his own sphere, and I do not share its responsibilities. He was called upon to sanction the arrest of trespassers. Affidavits which he regarded as sufficient, were laid before him, and he granted the arrest. I am called upon to relieve an officer of the United States from a false and tortious imprisonment. He had to decide, I suppose, whether the party who complained before him had a right to the process he sought; he has decided that question. I have to inquire whether under any supposed cover of that process, the laws of the United States have been violated in the imprisonment of their officers, and this question I am going to decide.

And how do the learned counsel ask me to prepare for my decision? Because the judge of a state court, in a proceeding necessarily ex parte, may have been imposed on by misstatements or suppressions of fact, am I therefore constrained in another cause, under another law, within a different constitutional jurisdiction, to make my hearing ex parte also; to hearken only to him, who has abused, it is said, the process of the law by falsehood or fraud, and refuse my ear to him whom the law specially enjoins me to relieve, if he has been wronged?

What is to be the consequence? A man swears to an assault and battery; the entire truth told, he was arrested for robbing the mint or the mail. Another swears to a trespass in breaking his close and carrying away his goods; the goods were stolen, and have been recovered under a search warrant. Both affidavits are the truth unless that means the whole truth; they make out the prima facie case of the plaintiff. What then? Is the officer to go to prison in default of bail, and to stay there because the rogue swore to only half the story? Or would the argument change if the plaintiff should substitute another man's oath for his own, keeping himself aloof the while, not caring to proclaim his whereabouts?

But this is not to meet the question before me in all its breadth. He who has read the act of congress of March 2nd, 1833, or who remembers the times to meet which it was passed, knows perfectly well that it looked to the contingency of a collision between the general and the state authorities. There were statesmen then, who imagined it possible that a statute of the United States might be so obnoxious in a particular region, or to a particular state, as that the local functionaries would refuse to obey it, and would interfere with the officers who were charged to give it force, even by arresting and imprisoning them. In direct antecedence, therefore, to the section under consideration, they framed two other sections of the same statute, one authorizing the military forces of the United States to be employed in aid of the judicial power; the other authorizing a resort to especial jails for the safe-keeping of United States prisoners. It was necessary to go one step further. The military power might enforce the execution of the laws, when the marshal had failed and been made a prisoner himself for attempting to execute them; the prisons specially constituted might detain those whom the military had arrested; but the officer of the law, arrested in the discharge of his duty, imprisoned for the offense of attempting to discharge it, perhaps at the suit of the resisting state, more probably at the instance of some private grief, what was to become of him?

This seventh section meets the case, and gives the remedy. Is it credible that wise men, framing a statute for such an emergency, meant to deny to their judges to hear the wrong before they adjudicated the redress; or to draw upon the consciences of the men who had instigated the outrage on their officers. and to accept the recorded formalities by which the outrage had been consummated, as the only reliable and legal means of as-

certaining facts and legitimate deductions from them?

It is not to be questioned, that there have been men in some quarters of the country, whose efforts, if successful, would have made this section as applicable in spirit, as it is in terms, to cases under the fugitive slave law; and I do not see the circumstances which at the present moment should make its reasonable construction, and the proper mode of giving it effect, different.

The whole course of the argument goes to show that the section applies alike to all cases in which an officer is imprisoned because of acts done in pursuance of the United States laws. It is altogether a fortiori, that the relief must extend to cases of arrest under civil process. The suit of an individual has no claims to superior dignity or consideration over a prosecution instituted by the state; nor is it generally as well considered, or as rightful.

I pass over the argument, which supposes that I am about to try this cause between the parties, to the exclusion of a jury. It is simply founded in mistake. I can neither acquit nor convict. Nor can my action arrest the proceedings in the state court, nor have any effect on the trial there. The act of congress, which gives to revenue officers the right to bring themselves for trial into the circuit court, when their official conduct is in question, does not extend to the officers of the law.

If, therefore, there was such a case made out ex parte by Thomas, and such as, prima facie and on his affidavits, showed an abuse of authority by the officers, I should hear the evidence which they wished to offer to repel it. But it is not necessary for me to do this, for there is in truth nothing in them which sufficiently connects any of the United States officers with the acts of violence of which Thomas complains.

There is nothing in them to show by whom he was wounded, nor in what manner, nor under what provocation, nor with what attending circumstances, nor who pursued, or menaced, or cried 'Shoot him," or fired or presented pistols. The relators are in no wise connected with any of these incidents, except that two of them are doubtingly and imperfectly referred to as having witnessed the scene near the river bank, and a third as having, a little while after the affair was over, given his name to a gentleman who inquired for it. As to Keith, the fourth named defendant in the writ of capias, he is neither named, nor described, nor alluded to.

And beyond this, there is nothing before me. The plaintiff himself, who could have sworn clearly and affirmatively to all the merits of his case, had made no affidavit. He could have told us how it came to pass that he was wounded, and whether he was the aggrieved or the aggressor in the affray. If he was not in fact the fugitive named in the warrant, and resolutely periled his own life by assailing the lives of those who were charged to apprehend him—or if they transcended their authority, and he was beaten without cause; his affidavit might have possessed us of it all, without a resort to inference or rumour. He too could have identified the parties that beat, or shot, or menaced him.

What others have sworn to, not only fails to implicate the relators in any act of violence whatever, but it leaves it absolutely to be guessed at, whether the plaintiff has been wronged at all. I cannot but wish that his personal affidavit had been found with the rest. He is absent; but he has constituted and instructed counsel, and I am justified in assuming that they have not failed to apprise him that his own statement, under oath, was the usual and might be, perhaps, the indispensable condition of success in his application to imprison the relators.

I have already had occasion to observe, that in a case arising under this statute, I cannot feel myself restricted by the practice that governs applications for bailable process. But I think it safe to avail myself of the light which that practice reflects. "No plaintiff," says Judge Sergeant, in the case of Nevins v. Merrie, 2 Whart. 500, "can be considered entitled to demand bail for a cause of action which he can neither positively swear to, nor allege sufficient facts and circumstances in the affidavit to satisfy the judge of its existence." Equally safe, it seems to me, would be the rule, that an officer of this court should not be detained in prison for an alleged abuse of his powers, without either a positive oath of merits from the plaintiff, or a sworn detail of circumstances to supply its place. Relators discharged.

### The Third Case.

The prisoners had not been discharged very long before they were arrested a third time, by the sheriff of Philadelphia county, under a bench warrant of outlawry from the quarter sessions of Luzerne county, based on an indictment found there by the grand jury, charging them with riot, assault and battery, and assault with attempt to kill; but not setting forth that the parties indicted were officers of the United States, nor that these alleged crimes had been committed while they were acting or professing to act in pursuance of a law of the United States, or under some order, process, or decree of some judge or court thereof. The prisoners had recently presented a petition for a habeas corpus, in which petition they averred, that all their action in the matter which forms the subject of indictment was lawful on their part, and in pursuance of a legal warrant directed to them by a duly constituted commissioner of the United States, and indorsed by one of the justices of the supreme court.

On the return of the writ, the petitioners

offering to prove these facts, it was objected, by Mr. D. P. Brown, that they were concluded by the warrant and indictment, and that this indictment not setting forth any case which could give this court jurisdiction to interfere under the act of congress of March 2, 1833, c. 57, § 7,[2] already stated, the court could not go behind it; and it was argued that if the federal courts could do what the petitioners asked, it could consider the case of every indictment found in any state, and, if they saw fit, discharge the party indicted; that this would lead inevitably to a conflict of state and federal jurisdiction, impossible to co-exist with union; and that, in this present case, conceding that the indictment was for an abuse of process, this court ought not to interfere and withdraw the accused from trial in the court where they were indicted, and which had first got jurisdiction of the case; because, if it did so, it would interfere with a settled rule of law, and there being no power under any act of congress to try and convict the parties now indicted for an abuse of process, they could not be indicted, tried nor convicted at all.

After argument on the other side, by Mr. J. W. Ashmead, U. S. Dist. Atty., the opinion of the court, Judge GRIER having been absent at Washington during the hearing, was delivered in substance as follows:

KANE, District Judge. This is one more branch of the controversies—I sincerely hope it may be the last—that have grown out of the attempted arrest of a fugitive slave in Luzerne county, some time since.

In deciding the case that was before me in February last between the same parties, I adverted to the spirit of the section of the act of congress of March 2, 1833, c. 57, under which I have awarded the writ of habeas corpus in this case, as this spirit is illustrated by the context, and by the time and circumstances of its enactment. On this point I have nothing to add. The phraseology of the statute is unequivocal in its import, and entirely consonant with its apparent object. It applies in broad and general terms to all officers of the United States, by whatever law or authority confined—with only this limitation, that the confinement must be for an act done or omitted in pursuance of a law of the United States, or in obedience to process of the federal courts.

This limitation presents the only question

---

[2] That either of the justices of the supreme court, or a judge of the district court of the United States, in addition to the authority already conferred by law, shall have power to grant writs of habeas corpus in all cases of a prisoner or prisoners, in jail or confinement, where he or they shall be committed or confined, on or by any authority or law, for any act done, or omitted to be done, in pursuance of a law of the United States, or any order, process, or decree of any judge or court thereof.

on which I have to pass. I am not called upon to inquire by what form of process the relators are held, by whom it was solicited or authorized, or issued or executed; but whether our officers are or are not imprisoned for acts done by them in pursuance of law or process. This is clearly in part a question of fact; and it seems to me that in determining it, I cannot be restricted to the evidence which may be found among the records of another court.

An illustration or two, not altogether without suggestive analogies in the history of our times, may make this plainer than a studied argument. If in a momentary fervour, a state should so far forget the constitution of the United States as to denounce every apprehension of a fugitive as a battery or a riot, and a court were to sentence the marshal's officers because they had obeyed the act of congress of 1850 [9 Stat. 462]; or, if the statute of a state had inhibited the collection of duties on imported goods, and the state court had imprisoned an officer of the customs for disregarding the enactment; or, if a state, in the transcendental spirit of reform, should forbid the infliction of capital punishment within its borders as a crime, and her courts were to convict our marshal of felony for executing our writ that commanded him to inflict it; can any one doubt, whether, under the words or according to the spirit of this section, it would be my duty to discharge him? A federal officer, undergoing imprisonment for an act definitely enjoined on him by the laws and process of the United States!

And yet, I can well imagine that the record in either of these cases would say nothing of the official character of the prisoner, or of his justification under the authority of the general government. If, then, the act of congress is to be made operative for the protection of the officer, he must be permitted to go behind or beyond the record, under which he is confined. And if he could claim to do this, even after conviction, how much more clearly before? If not concluded by the result of a trial, of which he had notice, and in which he perhaps took part, how much more clearly not by the preliminary action of a committing magistrate, or the ex parte finding of a grand jury!

The rule which has been referred to, as obtaining so generally in the cases of concurrent jurisdiction, that the court which first asserts jurisdiction, shall retain it to the end, does not apply. That is a rule of comity, founded on the general convenience, seeking to avert a conflict of action between two sets of courts. It assumes that the jurisdictions are concurrent, and the controversies the same.

But in cases like that before me, either the subjects of controversy in the two courts are not the same, but the proceedings involve differing questions of law or fact; or invoke differing modes of relief or

censure; or else, all these being the same in the two courts, it was the object and purpose of the act of congress to make the jurisdiction of the federal court revisory, and its action controlling, for the very reason that otherwise, such a conflict might exist between the two. On the first of these suppositions, there has been no prior assertion of jurisdiction by the tribunal of the state; on the other, the relation of the federal to the state courts is adversary rather than concurrent. In a word, then, as I read the section, it is my duty to hear and determine, notwithstanding the proceedings that have been had before a state court, just so far as may bear upon the question of the relators' right to a discharge under the laws of the United States. But no further. I am not to decide the question of their guilt or innocence upon the charges preferred in this indictment. I have no authority to do this, either without or with a jury. My duties are performed when I have released the prisoner from unlawful imprisonment; for that imprisonment is unlawful, however formal it may be, that affects to punish for an act enjoined or justified by the supreme law of the land; or when I have remanded him to abide his sentence, or to take his trial.

It has been urged that my order, if it shall withdraw the relators from the prosecution pending against them, will in effect prevent their trial by jury at all, since there is no act of congress under which they can be indicted for an abuse of process. It will not be an anomaly, however, if the action of this court shall interfere with the trial of these prisoners by a jury. Our constitutions secure that mode of trial as a right to the accused; but they nowhere recognize it as a right of the government, either state or federal, still less of an individual prosecutor. The action of a jury is overruled constantly by the granting of new trials after conviction; it is arrested by the entering of nolle prosequis while the case is at the bar; it is made ineffectual at any time by the discharge on habeas corpus—it is in many cases controlled. or even negatived in advance, by the judge's certificate of probable cause. And there is no harm in this. No one imagines that because a man is accused, he must therefore of course be tried. Public prosecutions are not devised for the purpose of indemnifying the wrongs of individuals—still less of retaliating them. Their objects are general: they look to the public well being; and if this can be more readily or more certainly promoted by withholding the cause from trial than by pressing it on to a verdict. it is politic, and it is not unjust, so to withhold it.

Yet, though the marshal or his deputy cannot be tried by a jury, if he has acted in obedience to federal process, he may still be punished if he has abused it, and that by the court itself from which the process issued. The misbehaviour of any of our officers in their official transactions is a contempt, specially excepted from the operation of the act of 1831 [4 Stat. 488]; [3] and being so excepted, it remains within our judicial cognizance. We may vindicate, therefore, the abuse of our process in the most summary manner, and with an emphasis of censure that can rarely be incommensurate with the offence.[4]

And on the other hand, there seems to be good reason why the court which issued the writ should itself judge of the fidelity with which it has been executed, and either punish or protect its ministerial officer. The process is not merely a warrant, but a mandate also, to be obeyed by the officer without regard to his judgment of its propriety, or his sympathies, or his fears. And the same local statute, the same sectional excitement, the same indignant feeling, whether enlightened and honest, or the reverse of both, which denounces the marshal for execution of a writ, should more properly condemn the judge for awarding it. It is right that the responsibility should attend upon the discretion. But all this is foreign to the question before me.

If the evidence shall present the case of an imperfect justification; if it shall show that these relators, or any of them, have transcended the rightful limits of their authority, and have wilfully or ignorantly violated the law, no considerations of policy or sympathy will press upon this court to rescue them from punishment, by withholding them from the tribunal which demands their presence. But, on the contrary, if it shall appear before me that they honestly and rightfully sought to execute their writ; that they employed force only because it was needed, and no more than was needed;—they must not be withdrawn from their daily recurring official duties, and sent away with the sanction of the court, under whose mandate they have acted, and by whom their action has been approved, to take their trial in a distant part of the country. I have unreserved confidence in the ability, integrity, and patriotism of the court from which this bench warrant has issued; but I may not

[3] By which it is enacted. "that the power of the several courts of the United States to issue attachments and inflict summary punishments for contempt of court. shall not be construed to extend to any case. except the misbehaviour of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice. the misbehaviour of any of the officers of the said courts in their official transactions," &c.

[4] It is possible, for the reason which is suggested by the argument in the text, that while the act of congress of 1883 provides for the transfer to the federal court by certiorari of proceedings instituted in the state courts against officers of the revenue. it makes no such provision for the case of officers of the law: the law of contempt being regarded as adequate to the punishment of abuses of legal process.

deny to these relators a discharge from what I deem unlawful imprisonment, however content I might be to submit my own liberty or honour to the guardianship of the learned justice who presides there.

I must therefore proceed to hear the case on its merits under the act of congress, and to that end must receive the evidence which is offered by the relators.