GOFF *v.* COUGLE.

|     |     |
| --- | --- |
| 118 | 307 |
| 122 | 555 |

1. TITLE TO LAND—RIPARIAN RIGHTS—UNSURVEYED ISLAND.

Under a deed of land bounded by a meandered river, the grantee, *prima facie*, takes title to the middle thread of the main channel of the stream, and may maintain his right to a so-called "island" lying between such channel and the main land, as against one who, claiming through deeds of the "island," fails to show that the government ever surveyed or treated the intervening land as such.[1]

2. TRIAL—INSTRUCTIONS—EVIDENCE.

An instruction permitting the jury to find a certain fact is error, where there is no evidence upon which to base such a finding.

Error to Macomb; Eldredge, J. Submitted June 17, 1898. Decided October 3, 1898.

Trespass *quare clausum fregit* by Lewis B. Goff against Joseph Cougle. There was a judgment for plaintiff, and defendant appealed. Pending the hearing on appeal, defendant died, and the cause was revived in the name of his administrator, John Cougle. Judgment reversed.

*Byron R. Erskine*, for appellant.

*Franklin P. Monfort*, for appellee.

LONG, J. This action of trespass was brought in justice's court, and removed to the circuit on plea of title. The case was tried before a jury, who rendered a verdict in favor of plaintiff. Defendant brings error.

The plaintiff claimed to be the owner and in possession of an island in the Clinton river, in Macomb county. He introduced in evidence certain deeds of conveyance, describing the lands in controversy as: "Being the island

---

[1] With this case, as reported in 42 L. R. A. 161, is an extensive note on the title to land under water.

in section 19, in township 3 north, of range 12 east, containing 21 37-100 acres, be the same more or less." The first deed offered in evidence by the plaintiff bears date January 9, 1833, given by James Cheney to Clem Cheney, and recorded in the office of the register of deeds of Macomb county, January 10, 1833. Deeds of this same description were also offered by him, as follows: Clem Cheney to James Cheney, July 29, 1834, recorded August 2, 1834; James Cheney and wife to Peleg D. F. Ewell, dated August 22, 1850, recorded May 8, 1851; Peleg D. F. Ewell to Franklin Selleck, dated December 5, 1851, recorded January 7, 1852; Franklin Selleck and wife to Lebbeaus Ewell, dated September 1, 1852, recorded September 22, 1852; Lebbeaus Ewell and wife to John George, dated October 7, 1853, recorded October 19, 1853; John George, by his executrix, to Sally George, dated April 6, 1864, recorded October 20, 1864; Martha J. Bacon et al., heirs at law of Sally George, to Lewis B. Goff, plaintiff, dated March 5, 1894. Many of these deeds conveyed other lands, and in most of them the lands are designated as "the island in the Clinton river, section 19, town 3 north, range 12 east," etc.

Plaintiff introduced evidence tending to show that, since and up to and including the year 1897, he and his grantors had paid the taxes on the land in controversy. The lands are described on the tax rolls for the various years as the island, and central part of the southeast fractional quarter, of section 19. This land was assessed with other lands during those years. Some evidence was given tending to show that the Clinton river, up to and above this land, was a meandered stream, and the farms along it were surveyed as bordering on the river. Plaintiff also gave evidence tending to show that this so-called "island" was situate about the center of section 19; that, prior to 1842, the island was fenced all around on the inside of the channels of the stream by rail and brush fences, and that 19 years ago some traces could be seen of these fences; that it was cleared of timber except a few trees, and that,

while the Cheneys owned it, they cut hay there, pastured the land, and sowed oats on a part of it; that there was but one island in the river; that, while Ewell owned it, he pastured it, building a bridge to it for his cattle and sheep to cross over; that others of plaintiff's grantors cut hay on the premises; that the fences, however, were not kept up for the last 15 years. Some of plaintiff's witnesses describe the land as being entirely surrounded by the waters of the Clinton river; that the Clinton river is the boundary line between the adjacent farms; and that the island is between the farms. The plaintiff testified, as to the trespass complained of, that defendant went upon the land, and commenced to build a fence next to the river; that he forbade the building of it; that defendant also cut some timber thereon.

It appeared, further, from the testimony of plaintiff's witnesses, that, some 30 or 40 years ago, the Clinton river was divided at the head of the island, the main channel extending to the southward along other lands owned by the plaintiff, cutting them off from the island, which is on the west side of the main channel. These lands on the main shore were also owned by the plaintiff's grantors, and the island used in connection with them. The defendant owned the lands to the southwesterly. Plaintiff's witnesses say that in the earlier days there was a well-defined channel between the lands now owned by the defendant and the lands in controversy, so that, by the coming together of the waters which are divided at the head of the lands, the island is formed. These witnesses leave it somewhat uncertain as to the time when the waters of the river became so dried up that the channel on the southwesterly side was not filled except in times of high water, though they say that there is a well-defined channel there now, through which the water flows in times of high water.

The defendant claims title to the lands by conveyances as follows: A warranty deed from Ephraim Calkins and wife to Joseph Cougle, dated December 11, 1846, conveying, among other lands, a parcel —

"Beginning at the quarter stake on the north side of section 30, in township 3 north, of range 12 east; thence running south, along the line through the center of said section, 5 chains and 75 links; thence south, 75 degrees east, with the nonius set 4½ degrees east of north, 12 chains and 75 links; thence north, parallel with the line through the center of section 19 in said town, 29 chains and 10 links, to the bank of Clinton river; thence up said Clinton river, to the said center line; thence south, along said center line, 24 chains and 66 links, to the place of beginning. Also one other piece of land, beginning at the quarter stake; thence running south, along the line from the center of said section 30, to a stake standing 10 chains north from the center stake of said section 30; thence west, parallel with the north line of said section, 12 chains and 50 links; thence north, parallel with said center line, to the north line of said section; thence north, on a line parallel with the line of section 19, to the north line of the southwest fractional quarter of said section 19; thence, along the north and east lines of said fractional quarter, to the place of beginning. All in the town of Shelby, Macomb county, Michigan; containing 111 75-100 acres, more or less."

This deed was recorded February 21, 1848.

Defendant also offered in evidence a warranty deed from Fitch Rossman and wife to Ephraim Calkins, dated February 2, 1835, conveying the E. fractional ½ of the S. W. fractional ¼ of said section 19, recorded December 9, 1835; also a deed from N. C. Naramour to Ephraim Calkins, conveying the land described in the deed from Calkins and wife to Joseph Cougle. These deeds describe the lands known and described in the plaintiff's deeds as the island in the Clinton river, unless it may be said that the deeds are limited to the lands extending only to the south channel of the river.

Defendant contended that the lands claimed by plaintiff do not constitute an island; that they were never surveyed as such by the United States government; that what is spoken of as the south or old channel, the southern boundary of the so-called "island," is but an old ravine, which at times is perfectly dry; that the Clinton river lies be-

tween the lands in dispute and the plaintiff's land; and that such land is wholly on the defendant's side of the river. Defendant gave testimony tending to show that there was little or no water in the so-called "south channel," except in high water, and had not been for more than 40 years, and in fact that there had never been an island there for that length of time. Defendant further gave evidence tending to show that he had pastured the land, and used it in connection with his other land, for more than 40 years; also, that the main channel of the river had been recognized as the boundary between the farms for more than 20 years; that the so-called "island" had never been ·plowed or any hay cut upon it. He also offered in evidence tax receipts for the year 1857, and many other years since, showing that the lands had been assessed under the description of his lands, and the taxes paid by Joseph Cougle. Some evidence had been given on the part of the plaintiff tending to show that Joseph Cougle made overtures for the purchase of these lands from some of plaintiff's grantors. This was denied by defendant. Plaintiff also gave some evidence tending to show that the defendant's intestate had felled trees and brush in and across this ravine or channel to keep the water from flowing therein.

The main question raised by counsel for defendant relates to certain portions of the charge, which will be referred to hereafter.

There is no evidence in the case that this so-called "island" had ever been surveyed as such by the government. There is nothing upon the record to show but that this parcel of land belonged to, and was surveyed by the government as a part of, the governmental description which would be included in the lands of the defendant. The plaintiff did not trace title back to the government. The first deed in his chain of title is from James Cheney, in 1833, and does not refer to any governmental survey. What rights at that time James Cheney had in the land does not appear; nor does it appear that the government

ever recognized it as an island. It is true that the deed
from Cheney and wife to Ewell, in 1850, in describing the
land, stated "according to the United States survey."
No government plat is contained in the record; nor is any
reference made in the record to any authority from the
government to treat this land as an island surveyed and
separated from the main land, so that it became detached
by the government from the quarter section of which it
naturally became a part. The main channel of the river
is between the plaintiff's land and that in controversy. It
is a stream of considerable size; and the defendant's testi-
mony, as well as considerable of plaintiff's testimony,
shows that this "south channel," so called, is in fact com-
paratively dry, except in the time of freshets. Yet the
court charged the jury that if the government surveyors
surveyed, measured, and designated it as an island, and
the jury found that there was an island there and thus
surveyed, they might consider that parcel of land as the
land conveyed by the various conveyances to the plaintiff;
or, if the parcel of land so surveyed or so commonly
known and designated as an island was the parcel of land
on which the defendant did the acts complained of, even
if it appeared that it was not usually surrounded by
water, so that it could not properly be termed an island,
yet they would be justified in considering that parcel as
the island covered by the conveyances from Cheney to
plaintiff. Counsel for defendant contends that this por-
tion of the charge not only permitted the jury to find, but
assumed, that the island had been surveyed by the gov-
ernment; and this without any evidence whatever to base
such finding upon. Upon the defendant's theory and
claim in the case, this parcel was included within the
description of his farm, and his lands extended to the
thread of the main channel of the river. He contended
that he took possession of his farm in 1846, very soon
after he received his deed from Calkins, and that he had
used this piece of land in connection with his farm ever
since, and had pastured his cows there for 40 years. We

think the court was in error in this portion of the charge.

The court charged the jury that there was no evidence that the plaintiff had acquired title by adverse possession. Whether there was such evidence given by the plaintiff we need not now consider, as that question was not submitted to the jury, and the plaintiff is not here complaining of that, he not having appealed.

The court left the question to the jury to determine whether or not there was an island in the river, and the jury must have found that there was; so that question must be taken as settled that there was an island in fact. But, so far as the record shows, there was no island there which had been recognized by the government as such, and which was no part of the main land. The deeds to defendant conveyed to him the lands in controversy, unless the south channel is treated as the Clinton river, within the meaning of the deeds. The deeds cannot be so construed, as even upon meandered streams the lands extend to the middle thread; and it appears that the north channel is the main channel, so that defendant's deeds conveyed lands extending to the middle of the main channel. These deeds were given in 1846. Can it be said that the plaintiff, without showing some conveyance from the government to himself of this land, describing and designating it as an island, has shown a paramount title? We think not. In *Railroad Co.* v. *Schurmeir*, 7 Wall. 272, the question was as to the title to an island in the Mississippi river, which at the time of the survey was a mere sand-bar, about 90 feet wide and 160 feet long, separated from the main land by a slough or channel 28 feet wide. The island was submerged at high water (of which no notice was taken in the survey), and the slough was insignificant in comparison with the main river. At the time of the action, the sand-bar had been filled in and covered with valuable improvements; and the contest was between the owner of the adjoining fraction and the railroad company, which claimed the bar under a new survey made by a United States surveyor, and a congressional grant of

certain odd-numbered sections. It was held that the sand-bar was included in the first survey as a part of the main land.

*Prima facie*, the title of the riparian owner extends to the middle thread of the stream. The defendant's deeds presumptively, under the facts shown here, convey the title to the land in controversy, and that presumption is not overcome by the plaintiff's deeds.

We think no other questions need be discussed.

The judgment below must be reversed, and a new trial granted.

The other Justices concurred.