Argued 28 November, 1899; decided 12 August, 1901.

## ALBERT *v.* SALEM.

[ 65 Pac. 1068, 66 Pac. 233.]

RE-ESTABLISHING BOUNDARIES—SURVEYS.

1. In determining the location of boundary lines the endeavor is always to find the line as actually run by the surveyor, and in pursuing that end courses and distances yield to visible monuments and lines, but where the claim is made that the actual line differs from that required by the courses and distances, the testimony to that effect should be very convincing: *King* v. *Brigham*, 19 Or. 560, cited and applied.

JUDICIAL NOTICE OF PUBLIC SURVEYS.

2. Under Hill's Ann. Laws, § 708, subd. 3, directing courts to take judicial notice of the public acts of the legislative, executive, and judicial departments of the state and federal governments, courts will take notice that a township was divided by the surveyor general into sections, and that donation land claims surveyed under his direction are numbered consecutively.

EFFECT OF PRIORITY OF SURVEY.

3. In determining questions of boundary the lines first surveyed have precedence over those surveyed later, irrespective of when the surveys may have been commenced.

TAXING COSTS IN SUPREME COURT—JURISDICTION.

4. Where a plaintiff successfully appeals to the supreme court he can not there tax the disbursements of the trial in the court below, since the appellate court has no jurisdiction except by appeal, and the trial court has never considered these items.

COST OF UNNECESSARY PAPERS IN TRANSCRIPT.

5. Parties will not be permitted to tax as a disbursement the expense of copying into the transcript unnecessary papers. Under Rule 2 only those papers should be included that are connected with some question raised by the appeal, and Rule 24 forbids taxing the expense of any unnecessary matter.

From Marion : HENRY H. HEWITT, Judge.

Suit against the City of Salem, resulting in a decree for defendant. REVERSED.

For appellant there was a brief by *Mr. John A. Carson*, with an oral argument by *Mr. Carson* and *Mr. J. H. Albert*, *in pro. per.*

For respondents there was a brief and an oral argument by *Mr. Geo. G. Bingham*.

MR. JUSTICE MOORE delivered the opinion.

This is a suit by J. H. Albert against the City of Salem and A. C. Dilley, its marshal, to enjoin the removal of a fence. The facts are that plaintiff is the owner of blocks 5, 12, 13, and 23 in University Addition to said city, and that the southern boundary thereof coincides with the southern boundary of the donation land claim of William H. Wilson. The county court of Marion County in February, 1870, established a county road, sixty feet in width, now known as "Mission Street," the center of which was located on the southern boundary of said claim. The surveyor's report of the location of said road, so far as material to the case at bar, is as follows : "Beginning at a point where the south line of the donation claim of William H. Wilson and wife intersects the center of the county road which runs from near the oil mill in Salem southerly towards the Pringle schoolhouse. From said point of intersection this survey runs north, 70 degrees 20 minutes west, along the said south line of the William H. Wilson claim ; the same being also the north line of the lands of Thomas Cross and Asahel Bush. Set a stake at the place of beginning ;  *   *   *  thence along the said claim line north, 70 degrees 20 minutes west, at 21 chains from beginning found Asahel Bush's northeast corner, being also the northwest corner of Thomas Cross' land,  *   *   *  at 60.50 chains intersect the east side of Liberty Street, where said street intersects the claim line ; thence across. Liberty Street  *   *   *  north, 50 degrees west, to the center of the cross street leading towards Westacott's brewery,  *   *   *  163 links, to a stake ; thence north 87 degrees 30 minutes west, along the center of said cross street, 5.10 chains, to the intersection of the east side of the extension of Commercial Street in the town of said South Salem, at which point set

a stake for the terminus of this survey." Plaintiff, claiming that this road was surveyed as a straight line from the point of beginning to the east side of Liberty Street, along the southern boundary of said blocks, erected a fence thereon on a line thirty feet northerly from and parallel with the center of said street as thus assumed by him ; but the council of said city, claiming that such fence, at the northeast corner of said Bush's land, encroached about nine or ten feet upon Mission Street, ordered the marshal to remove it, whereupon plaintiff commenced this suit to prevent the execution of said order, and the cause, being at issue, was tried, resulting in a decree dissolving the temporary injunction issued therein and dismissing the suit, and plaintiff appeals.

The existence of the county road is admitted by the pleadings, but its exact location by the viewers and surveyor is controverted by the parties. It will be remembered that the surveyor's report of said road makes the northeast corner of Asahel Bush's land and the northwest corner of a tract then owned by Thomas Cross an intermediate point in the survey. This point was intended to coincide with the northeast corner of the David Leslie and the northwest corner of the Francis S. Hoyt donation land claims, as originally surveyed, and the prior location of this point upon the ground must be decisive of the question involved in this appeal. The transcript shows that in 1844 William H. Wilson settled upon said claim, which was surveyed as claim No. 44, in township 7 south of range 3 west of the Willamette Meridian, and on July 25, 1853, having made the required proof of his settlement upon and cultivation of said tract, secured a donation certificate, and subsequently a patent of the United States in pursuance thereof. David Leslie settled upon a tract of public land joining Wilson's on the south, which was surveyed as claim No. 45 in said township,

and, having made his final proof, secured a donation certificate, and thereafter obtained his patent therefor. Francis S. Hoyt settled upon a tract of public land joining Wilson's on the south and Leslie's on the east, which was surveyed as claim No. 53 in said township, and, having made the required proof, he secured a patent granting the premises therein described. The field notes of the government survey of the north boundary of the Leslie Donation Land Claim read as follows: "Beginning at a corner previously established on the right bank of a cove of the Willamette River, for the northwest corner of claim 45 and the southwest corner of claim 44, in section 27, * * * thence south, 70 degrees 21 minutes east, on true line,—north boundary of claim 45 and south boundary of claim 44,—variation 19 degrees 40 minutes east * * *; 52.69 chains intersect northeast corner of claim 45 in line of claim 44 at post, from which a yew twelve inches in diameter bears south, 73 degrees west, 51 links, and an alder twelve inches in diameter bears north, 6 degrees east, 48 links." The field notes of the government survey of the north boundary of Hoyt's Donation Land Claim describe the land as follows : "Beginning at the northwest corner of claim 53 and the northeast corner of claim 45, on the south boundary of claim 44, in section 27,—variation 19 degrees 40 minutes east; thence south, 70 degrees 21 minutes east, on true line on north boundary of claim 53 and south boundary of claim 44, in sections 27 and 26, * * * 21.80 chains intersect northeast corner of claim 53 in angle of claim 46, on south boundary of claim 44, at stake." The field notes of the survey of the south boundary of the Wilson Donation Land Claim, as made under the direction of the surveyor general, read as follows : "From the southeast corner of claim 44, north, 70 degrees 31 minutes west, on random line,—south boundary of claim 44 and north

boundary of claim 45,—variation 19 degrees 40 minutes east, 83 chains intersect west boundary of claim 44, 25 links north of southwest corner of claim 44 and northwest corner of claim 45, in section 27, on right bank of a cove of the Willamette River. Drove a stake at old corner, thence south, 70 degrees 21 minutes east, on true line,—south boundary of claim 44 and north boundary of claim 45,—variation 19 degrees 40 minutes east, * * * 52.69 chains, northeast corner of claim 45 * * *; 74.50 chains northeast corner of claim 53 and corner of claim 46, in section 26, * * * 83 chains intersect southeast corner at stake of claim 44, corner of claim 46."

The evidence shows that the yew witness tree mentioned in the field notes as indicating the location of a stake originally set as the northeast corner of the Leslie Donation Land Claim was standing at the time this cause was tried, but that the alder referred to in the notes of the survey could not be definitely located. The southeast and the southwest corners of the Wilson Donation Land Claim, as originally located, are easily found, and a right line extending from one corner to the other is thirty feet southerly from plaintiff's fence; but by extending a line north 73 degrees east 51 links from the yew witness tree standing near the northeast corner of the Leslie claim, a point is found which is only twenty or twenty-one feet south of plaintiff's fence at that place. The evidence fails to show where the stake evidencing the location of the northeast corner of the Leslie claim was originally set by the deputy United States surveyor. No witness was produced at the trial who claimed to have seen the original stake, so as to be able to state that the point so located from the yew witness tree is the one at or near which the original monument was set. Mr. Asahel Bush, appearing as a witness for the defendants, testified that in 1860 he purchased, and now owns, a part of the Leslie Dona-

tion Land Claim, situated in the northeast corner thereof. This witness, in answer to the question whether he knew where such corner was located, said : "I know the northeast corner of the Leslie claim as found by the surveyors. Q. Where is that? A. Where a stone and an iron pin is." He also said : "When I purchased my land I had a survey made by Mr. Gordon. He had the field notes. Q. Were any witness trees in the neighborhood? A. Yes. I think Mr. Gordon stated he had made the government survey. I know he said, directly after examining the yew tree, that there was another one over in that thicket, and we went over there and he went right to it—an alder or ash. I know it was not a yew. Q. Has that corner remained since that time in its present place? A. Yes." Mr. Bush says he set a stone in the ground, having a large bottom and a small point at the top, to mark the location of the northeast corner of the Leslie claim, and in referring to the iron pin he says : "I put that there some years afterwards. I went to look for the corner, and I had some difficulty in finding it. The stone had become buried partially, and I drove a pin by the side of it."

On cross-examination the following questions were asked and answered : "Who did the surveying, Mr. Bush, when you put the stone in at that corner? A. It was not surveyed at the time I put the stone in, but the stake was there. Q. What stake are you referring to? A. I do not know whether established by Mr. Culver or Mr. Gordon. The stake was their planting, but it was rotten, and I put that corner in. Q. Did you ascertain that the stake was at the corner? A. I had known of the stake being placed there when it was surveyed by Mr. Gordon, and I knew about where it was." W. J. Culver, who had held the office of city surveyor of Salem, appearing as a witness for the defendants, testified, in

substance, that about 1886 he ran a line from the yew witness tree the course and distance mentioned in the field notes, and set a stake for the northeast corner of the Leslie claim. This witness, in answer to the question, ''Did you find any indications there of a corner?'' said, ''No, sir; it was out in the road, and there was nothing to indicate that a corner had been there formerly.'' He also says, in referring to the corner so located by him, ''There was no stone at the time I made the survey.'' Referring to the alder tree mentioned in the field notes, and speaking of the time when he located the corner, he says : ''There were three trees, all alder, but there was nothing to indicate that that tree is there. There is an alder tree about the course and distance, but there is no mark on it, and it would not be reliable. I did not consider it to be.'' In answer to the question, ''Is it possible for you to select, or I mean find, that corner directly from that tree only?'' this witness says : ''Well, it was all the evidence there was on the ground as to the location of the corner. Q. I will ask you if it would have been reasonably possible to have made a mistake in the location of the corner in proceeding as you did? A. I think there is no mistake about it being the course and distance given in the field notes of the county surveyor's office,—the government field notes.''

Alfred Gobolet, a surveyor of about twelve years' experience, being called as a witness for the defendants, testified that about 1890 he ran a line from the yew witness tree the course and distance designated in the field notes, and found a stone which had been set for the northeast corner of the Leslie claim, but found no iron pin at that point. He says : ''I looked for stakes, but could not find any anywhere.'' In referring to the number of witness trees to evidence a corner, he was asked, ''Then, as a matter of fact, would not a survey made by refer-

ence to one be less creditable than one made with two
monuments, there not being so much evidence to test its
correctness ?'' to which he replied : ''In that case you
would have to use the assistance of other corners to relo-
cate.''   In referring to the probability of the correctness
of a corner located from a single witness tree, he said,
in substance, that if the tree stood at right angles to the
line it would probably be more nearly exact than if it
stood at an acute angle to it.   B. B. Herrick, County
Surveyor of Marion County, appearing as a witness for
plaintiff, testified that he ran a line from the yew witness
tree to the stone, and found that it corresponded in course
and distance with those given in the field notes, and in
referring to the accuracy in locating a corner from one
witness tree he said, ''I would not rely upon one tree
altogether as being correct.''   This witness also said that
he ran a right line from the southeast to the southwest
corner of the Wilson claim, and found that this stone
was about nine feet north of such line.   In referring to
the lines run by him, the following question was pro-
pounded : ''Then, from your test, did you find the north-
east corner of the Leslie claim in the Wilson line?'' to
which he replied : ''Well, I didn't find it that way as it
lays there now ; but from what I could find in running
that line brought me to believe that that corner is not
where it was probably first located.   Q. In making a sur-
vey, should one place any reliance upon a corner which
was established by the course of one witness tree alone ?
What value would only one witness tree have ?   A. I
would not consider that as being evidence enough to
prove it.''

1.   This is substantially all the testimony that was
offered tending to show where the northeast corner of
the Leslie Donation Land Claim was originally located,

and the question is whether it is sufficient to identify such point. The rule is well settled in this state that it is incumbent upon parties who seek to re-establish boundaries of land to follow the steps of the person who made the original survey, and that the location of lines and monuments on the ground as made by him is controlling and takes precedence of courses and distances : *Lewis* v. *Lewis*, 4 Or. 177 ; *Goodman* v. *Myrick*, 5 Or. 65 ; *Raymond* v. *Coffey*, 5 Or. 132 ; *Weiss* v. *Oregon Steel Co.* 13 Or. 496 (11 Pac. 255); *Anderson* v. *McCormick*, 18 Or. 301 (22 Pac. 1062); *Hale* v. *Cottle*, 21 Or. 580 (28 Pac. 901); *Van Dusen* v. *Shively*, 22 Or. 64 (29 Pac. 76); *Kanne* v. *Otty*, 25 Or. 531 (36 Pac. 537); *Robinson* v. *Laurer*, 27 Or. 315 (40 Pac. 1042). In *King* v. *Brigham*, 19 Or. 560 (25 Pac. 150), Mr. Justice BEAN, referring to this principle, says : "While the rule of law is, as heretofore stated, that actual location of the lines and monuments on the ground will control over courses and distances, we think that, where it is claimed that such lines and monuments do not agree with the courses and distances, the evidence of their actual location should be so clear and satisfactory as to establish that fact to the entire satisfaction of the court, and to place beyond question the actual location of the line or monument." In *Johnson* v. *Archibald*, 78 Tex. 96 (14 S. W. 266, 22 Am. St. Rep. 27), Mr. Justice GAINES, speaking upon this subject, says : "Certain calls, such as for natural objects, marked lines, and corners, being less likely the result of mistake, in the absence of other evidence, prevail over calls for course and distance ; but the survey actually made is, in legal contemplation, the true survey, and it is always competent to show by any legal evidence where the lines were in fact run upon the ground. It follows, therefore, that whenever the evidence is sufficient to induce the belief that the mistake is in the call for natural or

artificial objects, and not in the call for course or distance, the latter will prevail, and the former will be disregarded.''

The boundary line of the Leslie and Wilson donation land claims having been run by the surveyor from a common point on the right bank of a cove of the Willamette River south, 70 degrees 21 minutes east, the stake set for the northeast corner of the Leslie claim should have been in a right line extending from the southwest to the southeast corner of the Wilson claim. Defendants' counsel makes the following admission in his brief : "We think it may be conceded that the government surveyor intended that the Leslie and Hoyt corner should be in a straight line between the southwest and the southeast corners of the Wilson claim.'' If the original stake set to evidence the location of the corner of the Leslie and Hoyt claims, in the Wilson boundary, is where the field notes would seem to place it with reference to the yew witness tree, it. is manifest that the point relied upon to uphold the decree does not coincide with the course given in the field notes, and hence the evidence of the actual original location of such point should be clear and conclusive. Mr. Bush says that Gordon discovered the other witness tree mentioned in the field notes, but he does not say that a line was run from either witness tree to relocate the northeast corner of the Leslie claim. Nor does it appear that Gordon was then a deputy United States surveyor, or the county surveyor of Marion County, so that the presumption could be invoked that official duty had been regularly performed : Hill's Ann. Laws, § 776, subd. 15. It will be remembered that Mr. Bush said the corner had remained in its present place since it was so relocated by Gordon, but on cross-examination he said : "I had known of the stake being placed there when it was surveyed by Mr. Gordon, and I knew about where

it was.'' The evidence shows that the stake set by Gordon could not be found in 1886, at which time W. J. Culver, not being able to discover the alder witness tree, set a stake for the northeast corner of the Leslie claim by measuring from the yew witness tree the course and distance specified in the field notes. If it be assumed that Gordon relocated the northeast corner of the Leslie claim by measuring from the alder witness tree the required course and distance specified in the field notes, it is evident that Mr. Bush's statement that he knew about where Gordon set the stake qualifies his statement that the corner has remained since Gordon's survey in its present place. How long a stake driven in the ground will remain standing is not disclosed by the testimony, but in 1886, when Culver made a survey of the Leslie claim, the stake set by Gordon twenty-six years prior thereto could not be found. The evidence is conclusive, we think, that Mr. Bush put in the stone at the point designated by Culver; and, as this was established from one witness tree only, the evidence of the location of the original stake set for the northeast corner of the Leslie claim is not so clear or satisfactory as to establish that fact to the entire satisfaction of the court, or to place beyond question the actual location of the monument, and, this being so, the intention of the surveyor and the right line as run by him must control.

There is another circumstance that seems to strengthen this view. It will be remembered that the surveyor's report of the county road which was established in February, 1870, shows that he began at a point on the south boundary of the donation land claim of William H. Wilson, where it was intersected by the center of the county road, etc. ''From said point of intersection this survey runs north, 70 degrees 20 minutes west, along said south line of the William H. Wilson claim * * *; at 21

chains from beginning found Asahel Bush's northeast
corner  *  *  *; at 60.50 chains intersect the east side
of Liberty Street, where said street intersects the claim
line." This shows that the county road, as run by the
surveyor, was a right line from the point of beginning to
Liberty Street, a distance of 60.50 chains, and the stake
set at Mr. Bush's northeast corner was undoubtedly a
monument in that line. At that time it may be presumed
that the stake so set by Gordon ten years prior thereto
was still in existence (Hill's Ann. Laws, § 776, subd. 33),
and was the one found when the road was surveyed. That
this stake was then in a right line from points at such
great distance from each other in the south boundary of
the Wilson claim tends to prove that it could not have
been set by course and distance from the yew bearing
tree only, but must have been placed there with reference
to the other witness trees, which were then standing,
thus reasonably showing that the course and distance
from the yew tree to the northeast corner of the Leslie
claim is not correctly stated in the field notes. But if it be
admitted that the northeast corner of the Leslie claim was
originally located nine feet north of the south boundary
of the Wilson claim, the first line surveyed and located
is, in law, superior, and the boundaries defined in it will
govern : 4 Am. & Eng. Ency. Law (2 ed.), 808.

Thus, in *Van Amburgh* v. *Randall*, 115 Mo. 607 (22 S. W.
636), the following instruction was given : "The court
instructs the jury that, notwithstanding you should find
and believe from the evidence that the eastern boundary
of survey 212 and the western boundary of survey 188
overlap each other, yet if you should further find that
survey 212 was first located and surveyed, and bounda-
ries and corners established, then in that event it has
priority over survey 188, and your verdict should be for
defendants." The jury having returned a verdict for

the defendants, judgment was given thereon, from which plaintiff appealed; and the supreme court, in affirming the judgment, say: "The court properly instructed the jury that if they found that surveys 212 and 188 over-lapped each other, and that 212 was first located and sur-veyed, and its boundaries and corners established, then survey 212 was, in law, prior to 188." In *Hale* v. *Cottle*, 21 Or. 580 (28 Pac. 901), Mr. Justice BEAN, in speaking of the priority of surveys as evidenced by the number of the donation land claim, says: "The copy of the official plats of these claims from the surveyor general's office, in evidence, shows that the Guild claim is number 54, while that of Neff is number 57; and, if we are correctly informed, the practice of that office was to number the donation claims in the order in which they were surveyed. If this be the case, the Guild claim was surveyed before Neff's, and certainly in that event Ford and Mitchell could not by any act of theirs take a portion of that claim and attach it to the claim of Neff. But, be that as it may, it is clear, both from Neff's notification and the official plat, that the notification of the Balch claim was prior in point of time to his; and, when he designated the line of the Balch claim as the termination of the south line of his claim, we must assume that he knew the loca-tion of that line, and only intended to take his claim with reference thereto. And, besides, when Balch filed his notification in the proper office, describing, as he was required by law to do, 'the precise tract of land claimed' by him, it ceased to be subject to entry as public land, and he had the right to occupy and maintain possession thereof so as to acquire a complete title to the soil. And the mere fact, if it be a fact, that Ford and Mitchell in-cluded a portion of the land claimed by him in the survey of the Neff claim, could in no way affect the line between them. This line was clearly designated by Neff in his

notification as the true dividing line, and it was the duty of the surveyor general, in making the survey, to so recognize it, which we think clearly appears from the evidence in this case he did; and if the stake claimed by plaintiff as the southeast corner of Neff's claim was set by Ford and Mitchell, it was done by mistake."

2.   Each donation claimant was required to notify the surveyor general of the precise tract of land claimed by him under the donation law, whereupon it was made the duty of the surveyor general to survey and mark out each claim with the boundaries as claimed: 9 Stat. U. S. 498, § 6.   Courts will take judicial notice of public and private official acts of the legislative, executive, and judicial departments of this state and of the United States: Hill's Ann. Laws, § 708, subd. 3.   A government survey of public lands is a public official act of the executive department of the United States, within the meaning of this section: *Rogers* v. *Cady*, 104 Cal. 288 (38 Pac. 81).   Under this rule this court, in the absence of any proof thereof, will take judicial notice that a tract of public land six miles square, called a township, is divided by the surveyor general into thirty-six parts, called "sections," and that donation land claims, as surveyed under his direction, are numbered consecutively in the order in which they are surveyed, beginning with the number 37 in each township: *Hale* v. *Cottle*, 21 Or. 580 (28 Pac. 901).

3.   In the case at bar the field notes show that the survey of the Leslie claim was commenced September 4, the Hoyt claim September 6, and the Wilson claim September 7, 1852; but the last claim having been surveyed as No. 44, the Leslie claim as No. 45, and the Hoyt claim as No. 53, it presumptively shows that, notwithstanding the survey of the Leslie and Hoyt claims may have been first commenced, the survey of the Wilson claim was first

completed, thereby giving to the boundary line of that claim precedence over those of the other claims.   For, if the contrary were true, it seems unreasonable to suppose that a random line would have been run on the south boundary of the Wilson claim, which had been established by the location of the boundaries of the Hoyt and Leslie claims one and three days, respectively, prior thereto.

Plaintiff, having built his fence with reference to the location of the southern boundary of the Wilson claim, and thirty feet distant therefrom, did not trespass upon the highway ; and, this being so, the decree of the court below is reversed, and the defendants are perpetually enjoined from disturbing said fences.      REVERSED.

Decided 7 October, 1901.

ON PLAINTIFF'S MOTION TO RETAX COSTS.  ·

MR. JUSTICE MOORE delivered the opinion.

4.   This is a motion to retax costs.   The decree having been reversed, the appellant filed a cost bill, and, objections thereto having been interposed, he filed an amended verified statement, from which it appears that he paid $30 to a stenographer for transcribing the shorthand notes of the testimony, and $25 to the clerk of the trial court for the transcript of the cause.   The sum paid for transcribing the testimony was disallowed by the clerk, who taxed only $15 for the transcript, whereupon his action in that respect was brought up for review.   It appears that in the absence of an official reporter in the trial court the plaintiff and the defendant employed stenographers, who reported the testimony in shorthand, and transcribed the notes thereof for the use of, and which were used in, the trial court, and thereafter sent up with the transcript.   If the cost of extending the

notes is allowable at all under the circumstances, it was a disbursement in the trial court; but, not having been there taxed, and no appeal therefrom having been taken involving the question of costs, this court is powerless in the matter.

5. An examination of the transcript shows that it contains copies of the original answer, motion to strike out parts thereof, a demurrer thereto, an order of the court thereon, an amended answer, a motion to strike out parts thereof, and a demurrer thereto, which were rendered nugatory by the filing of a second amended answer; and hence the outlay for the copies thereof in the record is not taxable as costs: Rule 24, 35 Or. 603, and note to Rule 2, 35 Or. 591. The computation of the fees properly chargeable for procuring the transcript of the cause, after eliminating such superfluous matter, shows that the clerk made a very liberal allowance therefor. These considerations lead to a denial of the motion.

MOTION TO RETAX OVERRULED.

Decided 12 August, 1901.