Argued January 23, decided January 30, rehearing denied
February 13, 1912.

## MICELLI v. ANDRUS.

[120 Pac. 737.]

NAVIGABLE WATERS—MEANDERS BY THE GOVERNMENT—PURPOSE.
1. The meander lines of public lands on bodies of water, made by direction of the surveyor general, are run to denote the windings of the bank and ascertain the superficial contents of each governmental subdivision on the stream.

NAVIGABLE WATERS—LANDS UNDER WATER—GRANT—BOUNDARY.
2. A grant by the federal government describing the land as extending to the bank of a navigable river, and thence with its meander conveys to the ordinary high-water mark.

NAVIGABLE WATERS—OWNERSHIP OF BED.
3. The boundary of government land situate on navigable streams only extends to the ordinary high-water mark; the United States holding no legal title to the bed except possibly in trust for the public.

NAVIGABLE WATERS—OWNERSHIP OF BED.

4. At common law the bed of navigable rivers was owned by the king for the benefit of the people, and after the colonies declared their independence the bed of such streams became vested in the people, subject to the superior right of navigation.

NAVIGABLE WATERS—BED—WHAT CONSTITUTES.

5. The bed of navigable rivers extends to the lines of the ordinary high-water mark from bank to bank.

WATERS—NONNAVIGABLE STREAMS—OWNERSHIP OF RIPARIAN PROPRIETORS.

6. The middle line of a nonnavigable stream is the boundary of a riparian proprietor's land.

WATERS—BOUNDARIES—NONNAVIGABLE RIVERS.

7. The boundary of public land on nonnavigable streams granted by the general government by describing the boundary as running to the bank and thence with its meanders, extends to the center of the river.

WATERS—NONNAVIGABLE RIVERS—BOUNDARY OF RIPARIAN OWNER—"CHANNEL"—"MIDDLE OF RIVER."

8. The middle line of a nonnavigable river at low-water mark is not the center of the channel, which means the continuous course of deepest water, but is a line equally distant from all points on the opposite banks at right angles with the thread at low-water mark.

WATERS—NONNAVIGABLE STREAMS—"THREAD OF STREAM"—MEASUREMENTS FROM LOW-WATER MARK.

9. Where one bank of a nonnavigable stream is much steeper than the other, placing the thread of the stream, as measured from high-water mark, on an exposed sand bar on one bank, when the water is low, the thread of the stream should be ascertained by measuring from the low-water mark.

EVIDENCE—JUDICIAL NOTICE—SURVEYS OF PUBLIC LANDS.

10. Judicial notice will be taken of the manner of making the original surveys of public land, and it is a matter of common knowledge that in making such surveys the margins of all bodies of waters of moderate size are meandered by the suveyors.

NAVIGABLE WATERS—TEST OF NAVIGABILITY.

11. The navigability of waters is a question of fact, and if a stream in its natural state is not adapted for bearing commerce, the meander of its banks by government surveys will not make it navigable.

TRESPASS—DAMAGES—PROOF.

12. Where in trespass for removing gravel, no evidence was offered to show the value of the gravel removed, compensatory damages cannot be awarded.

INJUNCTION—TRESPASSING UPON LAND.

13. Injunction lies to prevent a repetition of damages reasonably apprehended from threats to continue trespass on realty by removing gravel.

From Douglas: LAWRENCE T. HARRIS, Judge.

Statement by MR. JUSTICE MOORE.

This is a suit by Frank G. Micelli, Joseph Micelli, S. Hamilton, W. S. Hamilton, L. H. Hamilton and J. F. Templin against Frank Andrus to enjoin an alleged trespass on real property and to recover damages for injury thereto. It is stated in the complaint in effect that plaintiffs are the owners in fee and in the possession of a tract of land in Roseburg, particularly describing the premises, the west boundary of which is the "middle of the channel of the South Umpqua River," setting forth such line by courses and distances; that the defendant unlawfully entered upon the premises described and dug and removed therefrom soil and gravel to plaintiffs' damage in the sum of $100; and that he threatens to continue such trespass, which menace he will carry out unless restrained.

The answer denies each averment of the complaint and for a further defense alleges in substance that the river mentioned is a navigable stream, the banks of which were meandered by the United States government; that the title to the lands lying between ordinary high-water mark and the middle of such stream is not owned by plaintiffs and can never be acquired by them; that the premises described lie between the center of the South Umpqua River and the east meander line thereof which original angular survey forms the west boundary of the donation land claim of Aaron Rose and his wife, under whom plaintiffs claim as successors in interest, and they, as riparian proprietors, assert a claim to such soil and gravel which were taken from the bed of the stream, within the lines of ordinary high water and west of the middle of such stream in its natural stage.

The allegations of new matter in the answer were

denied in the reply, and the cause having ·been tried
the suit was dismissed, and plaintiffs appeal.

                                        REVERSED.

For appellants there was a brief over the names of
*Messrs. Coshow* and *Rice,* with an oral argument by
*Mr. Oliver P. Coshow.*

For respondent there was a brief and an oral argu-
ment by *Mr. Commodore S. Jackson.*

MR. JUSTICE MOORE delivered the opinion of the court.

It appears from the testimony that at the place
described in the complaint the South Umpqua River
flows northerly. Its western bank is high and abrupt.
The width of the stream at low water is about 65 feet,
and the flow is always close to the west bank. The
surface of the land, immediately east of the stream at
its low stage, gradually ascends to the well-defined
right bank which the water reaches at its flood in the
wet season when the stream attains to a width of about
500 feet. The title asserted by plaintiffs to the premises
described was obtained by a conveyance executed to
them by the administrator of the estate of Aaron Rose
deceased. A part of the description in their deed reads
as follows: "Thence along the north side of said
Micelli Brothers land to the east bank of the South
Umpqua River, thence following the meanders of said
river, north"—giving courses and distances. The
patent from the United States to Rose and his wife for
the entire tract, including the premises described in the
complaint contains calls and distances in part as follows:
"Running thence west 22 chains and 91 links to the
right bank of South Umpqua River; thence with the
meanders of said river up stream," stating courses and
distances, "thence leaving said river east," etc. These
grants extend the north and south boundaries of the

respective tracts to the same bank of the river, thence following the meanders of that stream, etc.

The testimony fully supports the fiindings made by the trial court to the effect that the South Umpqua River, at the place indicated is a nontidal, unnavigable stream, though it had been used at times for floating logs and wood; and that the soil at the place from which the defendant dug and removed earth and gravel is not properly an accretion to plaintiff's premises. The controverted findings are in substance that the evidence did not show where the middle of the river should be located when that stream was at an ordinary stage; that it could not be determined whether the material was taken from a place east or west of such line, and that for these reasons plaintiffs had failed to substantiate their cause of suit. It is admitted, however, that the gravel was obtained from a bar which is covered during floods, but when the river is low the place from which the sand and small pebbles were secured is several feet east of the water as it flows at that stage.

1, 2. The question to be considered is the proper location on a nonnavigable river, above tide water, of the boundary of land of a riparian proprietor whose. chain of title discloses that the bank of the stream on his premises was meandered when the original government survey was made, and the patent granting the land conforms to such measurement. When public lands bordering on bodies of water are meandered by direction of the surveyor general, the angular lines are thus run to denote the medium of the windings of the banks, and as a means of ascertaining the superficial contents of each governmental subdivision of the premises, the outlines of which, along the margin of the water are thereby rendered devious. *Railroad Co.* v. *Schurmeier*, 7 Wall. 272 (19 L. Ed. 74); *Hardin* v.

*Jordan,* 140 U. S. 371 (11 Sup. Ct. 808, 838: 35 L. Ed. 428) ; *Barnhart* v. *Ehrhart,* 33 Or. 274 (54 Pac. 195). If pursuant to the field notes of the original measurement the United States grants a tract of land, described as extending to the bank of the water and thence with the meanderings thereof by course and distance, the boundary of the real property is not to be determined by the marking on the ground of such angular lines, but by the commercial importance of the body of water which either forms the margin, or a part of the premises conveyed. Thus if a grant by the general government describe the land as extending to the bank of a navigable river and thence with the meanders thereof, specifying them, the boundary of the premises conveyed is, by the controlling rule established in Oregon, coincident with the line of ordinary high water in that stream. *Johnson* v. *Knott,* 13 Or. 308 (10 Pac. 418); *Montgomery* v. *Shaver,* 40 Or. 244 (66 Pac. 923) ; *Oregon* v. *Portland Gen. Elec. Co.,* 52 Or. 502 (95 Pac. 722: 98 Pac. 160) ; *Webb* v. *Demopolis,* 95 Ala. 116 (13 South. 289: 21 L. R. A. 62) ; *Hardin* v. *Jordan,* 140 U. S. 371 (11 Sup. Ct. 808, 838: 35 L. Ed. 428).

3. Such line is also, by the great weight of authority, the limit of the estate of the general government which never held a legal title to any part of the bed of navigable streams, except possibly in trust for a territory prior to its admission as a state. *Hinman* v. *Warren,* 6 Or. 408; *Bowlby* v. *Shively,* 22 Or. 410 (30 Pac. 154) ; *Astoria Exchange Co.* v. *Shively,* 27 Or. 104 (39 Pac. 398: 40 Pac. 92).

4. At common law the bed of navigable rivers was owned by the king who held the title for the benefit of the common people. The immigrants to the American colonies brought with them to our shores the principles of the common law and when the independence of the United States was declared, the rights of the

citizens to the beds and waters of navigable bodies of water became vested in them as a rule of property, subject, however, to the superior right of navigation. In *Martin* v. *Waddell,* 16 Pet. 367, 410 (10 L. Ed. 997), Mr. Chief Justice Taney, discussing this topic and declining to consider the authority of the king of England, since Magna Charta, to grant some particular subject a priority exclusive of the common privilege in and to navigable waters, says: "And we the more willingly forbear to express our opinion on this subject, because it has ceased to be a matter of much interest in the United States. For when the Revolution took place, the people of each state became themselves sovereign; and in that character held the absolute right to all their navigable waters, and the soils under them, for their own common use, subject only to the rights since surrendered by the constitution to the general government. A grant made by their authority must, therefore, manifestly be tried and determined by different principles from those which apply to grants of the British crown when the title is held by a single individual, in trust for the whole nation." To the same effect, see *Pollard's Lessee* v. *Hagan,* 3 How. 212 (11 L. Ed. 565); *Goodtitle* v. *Kibbe,* 9 How. 471 (13 L. Ed. 220); *Shively* v. *Bowlby,* 152 U. S. 1 (14 Sup. Ct. 548: 38 L. Ed. 331); *Johnson* v. *Knott,* 13 Or. 308 (10 Pac. 418).

5. The legal principle thus declared forms the basis of the right of a state to the beds of navigable rivers which, according to the rule established in Oregon, extend to the lines of ordinary high water from bank to bank constituting the true meander lines. *Parker* v. *Taylor,* 7 Or. 435; *Johnson* v. *Knott,* 13 Or. 308 (10 Pac. 418); *Parker* v. *West Coast Packing Co.,* 17 Or. 510 (21 Pac. 822: 5 L. R. A. 61); *Salem Improvement Co.* v. *McCourt,* 26 Or. 93 (41 Pac. 1105); *Lewis* v.

*City of Portland,* 25 Or. 133 (35 Pac. 256: 22 L. R. A.
736: 42 Am. Rep. 772) ; *Montgomery* v. *Shaver,* 40
Or. 244 (66 Pac. 923) ; *Johonson* v. *Tomlinson,* 41 Or.
198 (68 Pac. 406) ; *Muckle* v. *Good,* 45 Or. 230 (77 Pac.
743) ; *Hume* v. *Rogue River Packing Co.,* 51 Or. 237
(83 Pac. 391: 92 Pac. 1065: 96 Pac. 865: 31 L. R. A.
[N. S.] 396: 131 Am. St. Rep. 732) ; *Oregon* v. *Portland
Gen. Elec. Co.,* 52 Or. 502 (95 Pac. 722: 98 Pac. 160) ;
*Sun Dial Ranch Co.* v. *May Land Co.,* 61 Or. — (119
Pac. 758).

Though the title to the soil under navigable rivers
is not involved herein, the subject has been mentioned
in order to distinguish between such rights of property
in those streams and in nonnavigable rivers above tide
waters.

6.    The middle line of the latter streams has been
determined in this State to be the boundary of a ripa-
rian proprietor's land. *Shaw* v. *Oswego Iron Co.,* 10 Or.
371 (45 Am. Rep. 146). Such, also is the general rule.
*Hanlon* v. *Hobson,* 24 Colo. 284 (51 Pac. 433: 42 L.
R. A. 502) and notes.

7. The United States originally owned the bed of each
unnavigable river, and when any land bordering
thereon is granted by the general government or its
successors in title, by describing a border line as run-
ning to a bank of the stream and thence with its
meanders, giving them, the boundary of the premises
conveyed, unless restricted by express words, extends
by the overwhelming preponderance of judicial utter-
ance to the center of the river. 4 Am. & Eng. Ency.
Law (2 ed.) 828; Angell, Water Courses (6 ed.) § 29,
note 1; 5 Cyc. 897; 2 Farnham, Waters and Water
Rights, p. 1454; *Goff* v. *Cougle,* 118 Mich. 307 (76 N.
W. 489: 42 L. R. A. 161) and notes. The rule thus
established was adopted by the trial court which, in
attempting to ascertain the center of the South Umpqua

River at *the locus in quo,* took as the basis of measurements the ordinary high-water mark along the banks of that stream, and found that the middle line ran along a bar that was exposed at low water.

A text-writer, in discussing the location of borders of land, says: "If an unnavigable stream, in which the title of the riparian owner extends *ad filum aquae,* slowly and imperceptibly changes its course, the boundary line is the center of the new channel." Gould, Waters (3 ed.) § 159. This rule was followed in *Nebraska* v. *Iowa,* 143 U. S. 359 (12 Sup. Ct. 396: 36 L. Ed. 186), where the new channel instead of the middle of the stream was adopted as the limit of ownership.

8. The testimony in the case at bar does not show that any changes have been made in the flow of water in the river, either by accretion, avulsion, or reliction along plaintiffs' premises, but as they own the upland they are riparian proprietors and as such entitled to access to the stream at all stages, and in exercising that right, at the *locus in quo,* necessarly pass over their own land, the west boundary of which is the middle line of the river at low water therein. Such line may not be in the center of the channel, which means the continued course of deepest water in the river, but is a line equidistant from all points on opposite banks at right angles with the thread of the stream at the lowest stage of water therein.

The trial court's decision was probably predicated on the doctrine announced in *Trustees of Hopkins Academy* v. *Dickinson,* 9 Cush. (Mass.) 544, where it was held that the thread of a river was the middle line between the watermarks on each side of the stream when it was in its natural and ordinary stage at medium height, neither swollen by freshets nor shrunk by drought.

9. When the banks of a nonnavigable river are of nearly uniform slope so that the water receding uncovers the bed in such a manner that the thread of the stream, measured from the line of ordinary high water along the respective banks will never be a part of the exposed bed, except in cases of accretion, etc., the principle thus declared may not be an incorrect statement of the law involved. But, however this may be, since in the case at bar one bank is quite precipitous and the other gradually sloping, so that on the abrupt margin, the difference between the lines of ordinary and low water does not uncover much of the soil, but on the opposite bank the receding water reveals an extensive bed and places the thread of the stream, at a low stage, along an exposed bar wholly connected with the east bank, we think the lines of ordinary high water ought not to be taken as the basis from which to determine the center line of the river. In our opinion the correct rule is stated in *McCullough* v. *Wall*, 4 Rich. (S. C.) 68, 81 (53 Am. Dec. 715, 719), where the court says: The evidence showed that the water west of the rock was shallow, and that in dry summers much of it disappeared. * * The situation of the main channel, whether east or west of the rock, is unimportant, for the ordinary low-water mark on each side being fixed, the medium *filum aquae* is ascertained by measurement across, without regard to the depth of the water."

Section 9 of the act of Congress of May 18, 1796, providing for the sale of lands of the United States northwest of the Ohio River and above the mouth of the Kentucky River, and adopting the system of rectangular surveys in such territory, reads as follows:

"And be it further enacted that all navigable rivers, within the territory to be disposed of by virtue of this act, shall be deemed to be, and remain public highways:

And that in all cases, where the opposite banks of any stream, not navigable, shall belong to different persons, the stream and the bed thereof shall become common to both." Act May 18, 1796, c. 29, 1 U. S. Stat. 464.

The manner of surveying such lands was modified by the act of Congress of February 11, 1805, but the change is not considered material herein. Chapter 14, 2 U. S. Stat. 313. Pursuant to the act of Congress of April 24, 1820, c. 51, 3 U. S. Stat. 566, the Commissioner of the General Land Office issued to the surveyors general instructions respecting the manner of surveying public lands, from which directions the following excerpts are taken:

"(2) Both banks of navigable rivers are to be meandered by taking the courses and distances of their sinuosities. * * (3) Shallow ponds, readily to be drained or likely to dry up, are not to be meandered." 1 Lester's Land Laws, Regulations and Decisions, p. 714.

From these commands it would seem that only navigable rivers were to have been meandered.

10. Judicial notice will be taken of the manner of the original surveys of public lands. *Albert* v. *Salem*, 39 Or. 466 (65 Pac. 1068: 66 Pac. 233). It is matter of common knowledge that in making such measurements the margins of all bodies of water of any moderate magnitude are meandered by deputy United States surveyors.

11. The navigability of bodies of water is a question of fact and not of law and the running of lines along the banks of a river, in order to ascertain the area of a subdivision of the upland, cannot make such stream navigable when in its natural state it is not adapted to bearing on its surface boats and vessels engaged in commerce. Navigability in law can never exist independent of navigability in fact, and the fitness of a river in its original condition for the transportation of

freight and passengers by power or sailing craft can never be settled by fiat or by meandering the banks of the stream.

It will be remembered that as to nonnavigable rivers, the soil under which was originally owned by the United States, an early act of Congress made different owners of land on opposite banks of such streams tenants in common of the bed and waters thereof. The courts of last resort in most of the states, probably acting on such recognition by the federal legislature of the rights of riparian proprietors, have practically partitioned their estate in common into estates in severalty by making the thread of the stream a boundary of the respective owners' premises. Such border would be of little practical benefit if the middle of the stream were to be determined from the measurement of lines along the banks which might be reached at some stages of the water, but which, when receding, left what had once been the thread of the river on dry land, thereby depriving one of the riparian proprietors from access to the stream, except during high water when it was not needed, and giving to the opposite riparian owner both banks and the entire bed at low water when its use might be of great advantage. Upon principle it is believed that the thread of a nonnavigable river is to be ascertained from the measurement of the water at its lowest stage.

The defendant does not claim any right to the sand and gravel which he dug and removed from plaintiffs' premises. He maintains, however, that they are not entitled to such building material of which he took about 100 wagon loads.

12. No testimony was offered tending to prove the reasonable or other value of the substance removed and no damages can be awarded as compensation therefor.

13. The digging by defendant, however, constituted

more than a mere tresspass upon plaintiffs' premises, the title to which has been established, and in order to prevent a repetition of the damages reasonably to be apprehended from the threat to continue the harm to the real property, equity will enjoin the defendant's entry on the land without plaintiffs' license or authority. *Mendenhall* v. *Harrisburg Water Co.,* 27 Or. 38 (39 Pac. 399) ; *Garrett* v. *Bishop,* 27 Or. 349 (41 Pac. 10) ; *Bishop* v. *Baisley,* 28 Or. 119 (41 Pac. 936) ; *Moore* v. *Halliday,* 43 Or. 243 (72 Pac. 801: 99 Am. St. Rep. 724).

The decree is reversed and one will be entered here perpetually restraining the defendant, his agents and servants, from further injuring the land described in the complaint.

REVERSED.