DECIDED IN

# THE SUPREME COURT

OF

# OREGON.

Argued December 18, 1913, decided January 6, rehearing denied April 7, 1914.

## EAGLE CLIFF FISHING CO. *v.* McGOWAN.[*]

(137 Pac. 766.)

**Courts—Federal and State Courts—Concurrent Jurisdiction.**

1. When either a state or federal court first secures concurrent jurisdiction of a cause, the other cannot interfere with or control the process of the first, and any attempt to do so before a final decision is reached is void.

> [As to conflicts of courts of concurrent jurisdiction, see note in 29 Am. St. Rep. 310. As to right to control action as between two courts of concurrent jurisdiction, see note in Ann. Cas. 1912A, 150.]

**Judgment—Conclusiveness—Identity of Subject Matter.**

2. A decree of the Circuit Court of the United States for the Western District of Washington determining that defendants, under a license from the fish commissioner of Washington, had the exclusive right to maintain at places specified set nets for salmon until March 31, 1912, does not bar a suit in Oregon, after the date named, to enjoin obstructions of fishing rights at the same places under the laws of Oregon; the proper court having meantime decided that the boundary was so located as to include the places in question in Oregon, instead of Washington.

**Courts—Jurisdiction—Determination—Allegations in Pleadings.**

3. The authority of a court to hear and determine a cause depends upon the allegations of the initiatory pleading, and not upon the facts,

---

[*]On the question of the title to land under water, see note in 42 L. R. A. 161. And for the right of the state to grant tidelands, see note in 22 L. R. A. (N. S.) 337.

As to the right of a riparian owner on tidal or navigable waters to exclusive fishery, see note in 31 L. R. A. (N. S.) 396.    REPORTER.

and an error in determining the jurisdiction does not usually render the judgment void, but voidable only.

### Navigable Waters—Riparian Rights—Access to Water.

4.   As an incident to the lawful occupation of lands, one border of which is the low-water line of the Columbia River, the occupant has the private right of access at the sites occupied to and from the stream.

> [As to waters as boundaries, see note in 10 Am. Dec. 385.  As to nature of riparian rights and lands to which they attach, see note in Ann. Cas. 1913E, 709.]

### Navigable Waters—Ownership of Bed—Extent.

5.   The margin of Oregon's ownership of the bed of a navigable stream is the line of ordinary high water, and the state may convey the part between ordinary high and low water to the exclusion of the riparian rights of the upland owner.

### Fish—Exclusive Rights—Owners of Tidelands.

6.   A tideland owner on a navigable stream has the exclusive right to draw a seine on his own land; but he cannot exercise any prerogative in the manner of catching the fish differing from that which may be legally asserted by every other citizen of the state.

> [As to power of states to regulate taking of fish in tidewaters, see note in 23 Am. St. Rep. 837.]

### Monopolies—Exclusive Rights—Injunction.

7.   Under Sections 5272, 5283, 5294, 5298, 5303, 5304, L. O. L., providing for licenses for fishing salmon, the fees for licenses to be placed in a hatchery fund, and the place of operation under a license to be designated by the number of the license placed on the bank of the river, or on a buoy, the maintenance in a river, under a license, of rocks to which buoys are attached, a cable to which a boat may be fastened for fishing operations, and other appliances, tend to create an exclusive right of fishing, and are properly enjoined.

### Monopolies—Exclusive Right of Fishery.

8.   An exclusive right of fishing in a navigable stream cannot be granted to any person under a Constitution forbidding the creation of a monopoly in the pursuit of a lawful undertaking.

From Clatsop: JAMES A. EAKIN, Judge.

In Banc.     Statement by MR. JUSTICE MOORE.

This is a suit by the Eagle Cliff Fishing Company, a corporation, against H. S. McGowan, James McGowan, Eric Lindstrom, J. P. Coyle, John Doe, Richard Roe, Sam Jones and Bill Smith, to enjoin interference with the right of access to a navigable stream from a part of the tidelands fronting upon Sand Island, in the Columbia River, near its mouth.  The facts are that by proclamation of the President of the

United States this island was on August 29, 1863, withdrawn from sale, and reserved for military purposes. All of the tidelands abutting upon the island were granted to the United States by an act of the legislature of this state, approved October 24, 1864: Special Laws Or. 1864, p. 72. These lands were surveyed, and, from a plat thereof received in evidence, it appears that the general outline of the southerly and easterly shores of Sand Island form nearly a right angle, except that the corner is circular. The measurement, as far as material, divided the lands into tracts called sites numbered 1, 2, and 3. No. 1 embraces the corner; the length of the low-water line being about 4,500 feet. Sites 2 and 3 join No. 1 on the east in the order named; the length of each being 3,500 feet. Pursuant to an act of Congress approved July 28, 1892, Chapter 316, 27 Stat. 321 (U. S. Comp. Stats. 1901, p. 2529, 6 Fed. Stats. Ann. 712), the Secretary of War, on May 1, 1908, caused to be leased to the Columbia River Packers' Association, an Oregon corporation, sites numbered 2 and 3 for a term of three years. The defendant H. S. McGowan, having secured from the fish commissioner of the State of Washington licenses to catch salmon by operating until March 31, 1912, set nets in the Columbia River in front of Sand Island, located the lines intended to be occupied in placing such nets by securely anchoring buoys for that purpose. Such lessee thereupon commenced a suit in July, 1908, in the Circuit Court of the United States for the Western District of the State of Washington, Western Division, against the defendants herein, H. S. McGowan, Eric Lindstrom and J. P. Coyle, residents of that state, to enjoin the placing in the river of any obstruction in front of the demised premises, alleging in the bill that Sand Island was situated within the borders of that state. Such suit having been at issue

was tried, and on February 5, 1912, an interlocutory decree was given that, until March 31st of that year, the expiration of the then fishing license issued to McGowan, he and the other defendants were entitled to the exclusive right to maintain at the places specified set nets for the purpose of catching salmon, and the plaintiff in the suit was enjoined, until the expiration of the time so limited, from interfering with the exercise of that right. At the time such suit was begun the boundary between Washington and Oregon had long been in dispute, it being asserted by some persons that the line extended south of Sand Island; but on November 11, 1908, the Supreme Court of the United States, in an original suit instituted to ascertain the dividing line, determined that it ran north of that island, thereby including it within Oregon: *Washington* v. *Oregon,* 211 U. S. 127 (53 L. Ed. 118, 29 Sup. Ct. Rep. 47); s. c., 214 U. S. 205 (53 L. Ed. 969, 29 Sup. Ct. Rep. 631).

The plaintiff in such suit, on March 28, 1911, in consideration of the annual payment of $12,509, secured from the Secretary of War a lease of sites numbered 1, 2 and 3 for a term of three years. The defendants herein, on April 1, 1892, obtained from the master fish warden of Oregon licenses to catch salmon by operating in front of such sites 11 set nets and 2 seines. The plaintiff herein was incorporated under the laws of the State of Washington, May 15, 1912, and on the 11th of the next month was duly permitted to engage in business in the State of Oregon. The plaintiff in the suit in the federal court on June 5, 1912, in consideration of the payment of the annual rent of these sites, as hereinbefore stated, and the sale to it of all merchantable fish that might be caught, sublet to the plaintiff herein the several sites named for the remainder of the term. The defendants herein, as

copartners, undertaking to operate under the licenses last mentioned, anchored to heavy rocks, put into the river in front of these sites, and at right angles with the current, wooden buoys, about 4 feet long, and 6x6 inches wide, indicating the lines intended to be occupied by nets 150 to 360 feet in length to be set from 550 to 950 feet apart, and also placed in that stream, about 40 feet below the line of low water, and in front of these sites, a steel cable about 1,200 feet in length, which wire rope was fastened at each end and in the middle to heavy iron rails that were sunk by a hydraulic pump into the sand to the depth of about a foot. To this cable were attached buoys; the defendants intending to moor thereto vessels having machinery with which seines could be operated and the salmon that might be thus encircled removed without dragging the net to the shore. The plaintiff herein, on June 12, 1912, also secured from the master fish warden of Oregon licenses to catch salmon by operating at Sand Island two seines, each not to exceed 1,800 feet in length. Employees of the plaintiff removed from the river buoys, rocks, cable and iron rails so placed therein by the defendants, commenced operating seines in front of the specified sites to and upon which the nets were hauled, and thereupon instituted this suit.

The complaint states many of the facts hereinbefore set forth, and avers, *inter alia,* that the obstructions so placed in the river by the defendants interfere with an exercise of the plaintiff's right of access to the Columbia River from such tidelands. The answer denies the material averments of the complaint, sets up affirmative matters as separate defenses and by way of cross-bill, and as an estoppel to the maintenance of the suit, details the pleadings filed in and the decree rendered by the federal court in the suit referred to, alleging that the plaintiff herein is the successor in

interest of the plaintiff in that suit and in privity in estate with it. The reply put in issue the allegations of new matter thus set forth, and the cause being tried resulted in a decree as prayed for in the complaint, and the defendants appeal.

                    AFFIRMED: REHEARING DENIED.

For appellants there was a brief over the names of *Mr. Leslie Craven* and *Messrs. Griffith, Leiter & Allen,* with oral arguments by *Mr. Craven* and *Mr. Harrison Allen.*

For respondent there was a brief and an oral argument by *Mr. George C. Fulton.*

MR. JUSTICE MOORE delivered the opinion of the court.

1. The questions to be considered are: (1) Is the determination of the federal court, in the case referred to, a bar to the prosecution of this suit? (2) If that decree does not constitute an estoppel herein, has the plaintiff, by reason of its possession of the tidelands fronting upon a part of Sand Island, the right to enjoin the placing in the Columbia River, in front of its premises the obstructions mentioned, when the defendants were undertaking to exercise at such place privileges alleged to have been obtained from the master fish warden of Oregon pursuant to prior licenses, issued to them for that purpose? These inquiries will be treated in the order stated. Although the state and the federal courts constitute a uniform judicial system, they are so essentially distinct that neither, when concurrent jurisdiction has first been secured by one, can interfere with or control the process of the other, and any attempt to do so before a final decision has been reached is void: *Tenth Nat. Bank* v. *Sanger,* 42 How. Pr. (N. Y.) 179; *Ex parte Robinson,* 6 McLean, 355 (Fed. Cas. No. 11,935); *Ex parte Jenkins,* 2 Wall.

Jr. 521 (Fed. Cas. No. 7259) ; *Riggs* v. *Johnson County,* 6 Wall. 166 (18 L. Ed. 768) ; *United States ex rel.* v. *Council of Keokuk,* 6 Wall. 514 (18 L. Ed. 933).

2, 3. It will be remembered that, after the suit referred to was commenced in the federal court of the State of Washington, Sand Island was determined by the proper tribunal to be within the limits of the State of Oregon.   Invoking a maxim that equity acts *in personam,* it has been held by a few courts of last resort that a chancery tribunal having jurisdiction of the parties may enjoin a trespass on or an interference with land in another state; the decree operating directly on the person, and indirectly on the real property : *Great Falls Mfg. Co.* v. *Worster,* 23 N. H. 462; *Alexander* v. *Tolleston Club,* 110 Ill. 65; *Schmaltz* v. *York Mfg. Co.,* 204 Pa. 1 (53 Atl. 522, 93 Am. St. Rep. 782, 59 L. R. A. 907) ; *Kirklin* v. *Atlas Sav. & Loan Assn.* (Tenn. Ch. App.), 60 S. W. 149.   The weight of authority and apparently the better reason support the rule that a suit to enjoin a threatened trespass upon lands is local, and must be brought in the state where the property is situated : *Ophir Silver Min. Co.* v. *Superior Court,* 147 Cal. 467 (82 Pac. 70, 3 Ann. Cas. 340) ; *Columbia National Sand Dredging Co.* v. *Morton,* 28 App. Cas. (D. C.) 288 (8 Ann. Cas. 511, 7 L. R. A. (N. S.) 114). But, however this may be, the authority of a court to hear and determine a cause depends upon the allegations of the initiatory pleading, and not upon the facts, and an error committed in determining the jurisdiction does not usually render the judgment void; but such misconception of the question is generally regarded as voidable only : Van Fleet, Col. At., § 60.   As the bill filed in the federal court of the State of Washington averred that Sand Island was within that state, and as that tribunal has general jurisdiction of the subject matter thus involved, it will be assumed,

without deciding the question, that the relief there awarded was not void.

It will be kept in mind that the decree passed by the federal court did not purport to be anything more than temporary, and was to be in force only until March 31, 1912, the end of the then current fishing year. The rule is well-nigh universal that the doctrine of *res judicata* applies only to final determinations, and not to interlocutory decrees: 24 Am. & Eng. Ency. Law (2 ed.), 793; 2 Black, Judg. (2 ed.), § 509; 23 Cyc. 1126; 1 Van Fleet, Former Adjn., § 27. The decree invoked as an estoppel, to be available for that purpose, must be in force at the time of the alleged *res judicata*: Bigelow, Estop. (6 ed.), 65. This author, in a note supporting the legal principle thus asserted, observes: "Periodically securing grants of licenses, resting in the discretion of magistrates, creates no estoppel, and same objection may be made of recurring hearings, and be sustained at one time and denied at another, without regard to the state of the record in the given case."

As opposed to this postulate, defendants' counsel call attention to the following cases, a summary of which decisions may be found in a part of the syllabus of the first, to wit: "A right, question, or fact distinctly put in issue, and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies, and, even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified": *Southern Pacific R. R.* v. *United States,* 168 U. S. 1 (42 L. Ed. 355, 18 Sup. Ct. Rep. 18); *Baldwin* v. *Maryland,* 179 U. S. 220 (45 L. Ed.

160, 21 Sup. Ct. Rep. 105); *Keokuk & H. Bridge Co.*
v. *People,* 185 Ill. 276 (56 N. E. 1049); *Markley* v.
*People ex rel.,* 171 Ill. 260 (49 N. E. 502, 63 Am. St.
Rep. 234); *Peru Plow & Wheel Co.* v. *Ward,* 6 Kan.
App. 289 (51 Pac. 805); *Freeman* v. *Barnum,* 131 Cal.
386 (63 Pac. 691, 82 Am. St. Rep. 355).

An examination of these decisions will show that the
two actions referred to in each case embraced parts
of the same subject matter, and the question deter-
mined by the prior adjudication was identical with
another part of the same subject matter included in
the new action. Though the interference complained
of herein is averred to have been committed at the
same place as in the former suit, and the parties hereto
are identical except as to alleged privy in estate of one,
the right determined by the federal court was predi-
cated upon licenses issued to the defendants pursuant
to the laws of the State of Washington; while in the
case at bar the licenses involved were granted to the
defendants by authority of the State of Oregon. Since
the decree given by the federal court was not in force
when this suit was begun, and as the right involved in
the prior suit was not identical with that embraced
therein, the former adjudication is not a bar to the
maintenance of this suit.

Before considering the remaining question, it is
deemed proper to state more in detail the facts be-
lieved to be material to a correct understanding of the
cause. The water in front of sites 1, 2, and 3 of Sand
Island, for some distance from the shore, is quite shal-
low, and, the bed of the stream at that place being
free from snags, the shoal affords an excellent place
for taking salmon with seines. Those operated by the
plaintiff are about 1,800 feet long, 12 feet deep at the
shore end, and 50 at the other. Beginning at the deep
end of a seine, one of them is coiled on the stern of a

large flat-bottom boat built for the purpose of carrying such weight. From the narrow end of the seine when thus loaded, a line extending to the shore is drawn along the beach by horses. When ready to make a sweep, this boat is towed by a launch at a right angle with the current, the horses holding the shore end of the seine, and keeping it in line with the outward movement of the propeller. As the boat is thus taken toward the middle of the stream, its burden is gradually discharged, and when unloaded a headline fastened to the deep end of the seine, and kept afloat by corks, is carried to the shore, where it is hitched to other horses, which drag the outer end of the net toward and along the beach, thereby forming a loop, and retaining the salmon within the compass. To a rope on the upper edge of the seine are attached at regular spaces corks, which sustain such rope on the surface of the water, and to a line on the lower edge are fastened leads, whereby that cord is sunk to the bed of the river over which it is dragged. The meshes of a seine are too small for a salmon's head to extend through the interstice sufficiently to entangle its gills. When the bight of the seine is finally brought to the shore, any fish encompassed and retained by the sweep of the net are placed upon wagons, and hauled to a landing station to be shipped to a cannery. Obstructions in the bed of the river that can be reached by the lead line are apt to rend the seine, and through the gap thus made any salmon then within the scope of the net might escape. While a seine might possibly have been hauled along or across the wire rope referred to, without injury, the large rocks placed in the river as anchors, and the buoys attached thereto and to the steel cable, constituted such impediments that the operation of plaintiff's seines would necessarily have

been difficult, and the injury thereto apparently inevitable.

H. S. McGowan, as a witness for the defendants, testified that it was his intention to use set nets when other appliances were not being operated, saying, in effect, that their seines could not be used when the set nets were in position. It will thus be seen that, if the defendants are permitted to use set nets, and to operate seines in conformity with the licenses first issued to them by the master fish warden of Oregon, an exercise of such permission will necessarily deprive the plaintiff of all opportunity to take salmon by any means in the shallow water in front of the sites mentioned. When this suit was commenced, and thereafter, the plaintiff had legal possession of the tidelands fronting upon that part of Sand Island that is particularly valuable for seining purposes.

4. As an incident to the lawful occupation of lands, one border of which is the low-water line of the Columbia River, the plaintiff had the private right of access at such sites to and from that stream: *Micelli* v. *Andrus*, 61 Or. 78 (120 Pac. 737); *Van Dusen Inv. Co.* v. *Western Fishing Co.*, 63 Or. 7 (124 Pac. 677, 126 Pac. 604). In *Yates* v. *Milwaukee*, 10 Wall. 497, 504 (19 L. Ed. 984), Mr. Justice MILLER, discussing the question of access to the navigable part of a river, says:

"This riparian right is property, and is valuable, and, though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired. It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and, if necessary that it be taken for the public good, upon due compensation."

In that case the right of access was recognized as pertaining to the upland owner: *Weber* v. *Harbor*

*Commrs.,* 18 Wall. 57, 65 (21 L. Ed. 798). The right is here referred to, however, in order to show its acknowledged importance to the person lawfully entitled thereto.

5. Upon the admission of Oregon to the Union, February 14, 1859, the state took the title to all that part of the bed of the Columbia River, near its mouth, that is situate south of the middle of the north ship channel of that stream: 11 Stat. 383, c. 33. The margin of Oregon's ownership of the bed of a navigable stream is the mark made on its bank by the line of ordinary high water: *Micelli* v. *Andrus,* 61 Or. 78, 84 (120 Pac. 737), and cases cited. Subject to the paramount right of navigation, the state, pursuant to legislative enactments, has been authorized to sell and convey any part of its lands lying between ordinary high water and low water, and the grantee of such tidelands is the riparian proprietor to the exclusion of the upland owner: *Bowlby* v. *Shively,* 22 Or. 410 (30 Pac. 154).

6. Though the right of fishing in a navigable stream in Oregon is free and common to all the citizens of the state, the tideland owner on such a stream has the exclusive right to draw a seine on his own land: *Hume* v. *Rogue River Packing Co.,* 51 Or. 237, 244 (83 Pac. 391, 92 Pac. 1065, 96 Pac. 865, 131 Am. St. Rep. 732, 31 L. R. A. (N. S.) 396). While in the case at bar the sole privilege thus adverted to is held by the plaintiff in consequence of its possession of the demised premises, which right is undoubtedly of great advantage in landing salmon entrapped by a seine, such lawful occupant of the sites mentioned is not entitled to, and cannot exercise at such place, any prerogative in the manner of catching such fish differing from that which can be legally asserted by every other citizen of the state: *Hume* v. *Rogue River Packing Co.,* 51 Or.

237 (83 Pac. 391, 92 Pac. 1065, 96 Pac. 865, 131 Am. St. Rep. 732, 31 L. R. A. (N. S.) 396).

The buoys placed in the river to indicate the location of the lines intended to be occupied by the set nets, and the large rocks by means of which such floats were anchored, and the buoys fastened to the cable, if allowed to remain in the stream, would necessarily have prevented the plaintiff from hauling its seines to the shore. Notwithstanding such obstructions, it is contended by the defendants' counsel that the state, being the owner of the bed of the river, had, as an exercise of its police power, authority to grant an exclusive right of fishing in front of the sites described; that, their clients having obtained the prior licenses to catch salmon in the manner described, their privilege in this respect is superior to all others; that the spaces of 550 to 900 feet within the lines selected for the set nets afforded the plaintiff reasonable access from the tidelands to navigable water; and that the cable which lay on the bed of the stream did not constitute any obstruction to such right of passage. Based on these assertions, it is insisted that an error was committed in granting the relief prayed for in the complaint, and that an affirmance of the decree would be tantamount to giving plaintiff the exclusive right of fishing in front of Sand Island.

7. The provisions of the statute regulating the catching of salmon may be summarized as follows: The Governor, the Secretary of State, and State Treasurer constitute the board of fish commissioners, whose duty it is to appoint a master fish warden: Section 5272, L. O. L. The fish warden is required to collect all license fees, and pay the same to the State Treasurer, to be placed in the hatchery fund to be used for hatchery purposes: Section 5283, L. O. L. It is unlawful for any person to operate in any waters of the state

a set net or a seine without first having obtained from the fish warden a license therefor: Section 5294, L. O. L. It is unlawful for any person to fish for salmon in any waters of this state, unless he is a citizen of the United States, or has declared his intention to become such, and, for a period of six months, has been a *bona fide* resident of the State of Oregon or of another state bordering upon the Columbia River: Section 5298, L. O. L. Certain sums of money are annually collected from persons operating set nets, gill nets, seines, etc., and from cannerymen of, and from dealers in, salmon for licenses granted for that purpose. Every license so issued is required to be numbered and dated, and shall terminate on the 31st of March following its issuance: Section 5303, L. O. L. Any person having obtained a license to operate a set net shall cause to be placed and maintained on the bank of the river, or upon a buoy securely anchored in the stream on the location claimed, the number of such license, and for a seine he shall also cause to be placed and maintained on the seining ground the number so designated by the master fish warden: Section 5304, L. O. L.

8. Evidently the purpose of the statute in thus licensing persons engaged in catching salmon in nets and by seines was to protect such individuals from intrusion by nonresident fishermen who came to this state during the open season to pursue their occupation, and not particularly to designate, with respect to such means of taking fish, the places where the business might be conducted. The sums of money obtained by issuing such licenses were undoubtedly designed to create a fund to be used in propagating such species of fish, in order that the supply might not be wholly exhausted. Although the statute specifies the location, claimed by the licensee of a set net, must

be evidenced as indicated, the enactment does not expressly provide that the privilege so bestowed shall be exclusive as to such place. An exclusive right of fishing in a navigable stream cannot be granted to any person by a state, under a Constitution like ours, forbidding the creation of monopolies in the pursuit of a lawful undertaking: *Hume* v. *Rogue River Packing Co.*, 51 Or. 237, 259 (83 Pac. 391, 92 Pac. 1065, 96 Pac. 865, 131 Am. St. Rep. 732, 31 L. R. A. (N. S.) 396).

It is believed that the obstructions placed by the defendants in the Columbia River were not authorized by statute, and that they tended to create an exclusive right of fishing, the continuance of which was properly enjoined. Nor is it thought that plaintiff, by reason of its sole right to draw a seine upon its own ground, will be granted an exclusive right to catch salmon at the place indicated, for the testimony shows that fishermen operating gill nets made drifts in front of and behind such seines when they were being operated.

The defendants had intended to remove any salmon that they might catch in a seine to a boat moored to the cable. Their right to tow a seine over the same ground is admitted; but they must remove the salmon thus caught upon a steamer or other craft adapted to that purpose.

Believing that the decree is a correct adjudication of the rights of the parties, it is affirmed.

AFFIRMED: REHEARING DENIED.