Argued January 30; affirmed June 12; rehearing denied
September 11, 1945

# McDONOUGH ET AL. *v.* SOUTHERN OREGON MINING CO., LIMITED

(159 P. (2d) 829, 161 P. (2d) 786)

138

Before BELT, Chief Justice, and ROSSMAN, KELLY, LUSK and BRAND, Associate Justices.

O. H. *Bengtson,* of Medford, and *Ralph E. Moody,* of Salem, for appellant.

*George M. Roberts,* of Medford (Jeannette Thatcher, of Medford, on the brief), for respondents.

ROSSMAN, J.

This is an appeal by the defendant from a decree of the circuit court entered December 28, 1943, which awarded the respondents (plaintiffs) judgment against the defendant. The material parts are:

> "It is hereby considered, ordered, adjudged and decreed that said defendant, not having complied with the terms of said interlocutory decree by specifically performing said lease heretofore entered into between the plaintiffs and defendant under date of March 13th, 1941, * * * the plaintiffs do have and recover judgment against said defendant in the sum of Fifteen Hundred ($1,500.00) Dollars as their damages for failure to so specifically perform said contract and lease, * * * and that said judgment in the sum of Two Hundred ($200.00) Dollars * * * be, and the same hereby is, ratified, confirmed and approved in all things, * * *."

The interlocutory decree to which reference is made in the words just quoted was entered December 6, 1943, and said in part:

"It is hereby considered, ordered, adjudged and decreed that the defendant be, and it hereby is specifically ordered to comply and perform all of the terms, conditions and provisions of the lease agreement heretofore entered into between the plaintiffs and defendant under date of March 13, 1941, and to level, restore and repair said premises which it has mined, straighten the creek channel, remove dirt and obstructions from the irrigation ditches upon said premises, restore the topsoil, repair and restore the fences, remove boulders, rocks, brush and stumps situate upon said premises, level the tailings and that upon its failure so to do within twenty days from the date of the entry of this said decree, that the plaintiffs do have and recover judgment against said defendant in the full sum of Fifteen Hundred ($1,500.00) Dollars, being the amount of the damage sustained by the plaintiffs by said defendant's action and failure in failing to specifically perform the terms of such said lease and that in any event the plaintiffs do have and recover judgment against said defendant in the sum of Two Hundred ($200.00), the value of the crops which the plaintiffs were unable to harvest from said premises during the years 1941, 1942 and 1943 by reason of the failure of the defendant to specifically perform the terms of such said contract, and

"It is further considered, ordered, adjudged and decreed that this said court retain jurisdiction of this said cause in order to render and enter any further decree that might be deemed necessary herein * * *."

The interlocutory decree was followed on December 28, 1943, by a motion filed by the plaintiffs for the entry of judgment in their favor in the sum of $1,500, based on the defendant's neglect to comply with the

interlocutory decree, and for an additional amount of $200, based upon the loss of crops. The court sustained the motion by making the award of December 28, 1943.

The controlling issue presented by the appeal is whether or not the circuit court was warranted in granting the respondents any relief whatever. That issue is submitted to us in the form of seven assignments of error. Two attack the sufficiency of the complaint. Another submits that the evidence indicated that a court of equity lacked jurisdiction of the cause. Two more urge that a court of equity had no authority to award damages. A sixth contends that the evidence does not support the award of damages, and the last of the assignments claims that the court erred when it failed to dismiss the cause. The sufficiency of the complaint and the jurisdiction of the court were tested by neither motion nor demurrer. In the course of the trial, the appellant made no objection to the jurisdiction of the court nor to the admissibility of any evidence on the ground that the complaint failed to state a cause of suit. Neither a motion for a nonsuit nor a motion to dismiss the complaint was made at any time. So far as we are able to determine, the contentions embraced in the assignments of error were made for the first time after the appeal had been perfected. Throughout, the cause has been treated as one in equity.

The lease agreement, to which the quoted language referred, was signed March 13, 1941, by the respondents, as lessors, and by the appellant, as lessee. It described a tract of land owned by the respondents, and its purpose was to enable the appellant to mine, through the use of dredging machinery, the respondents' property for its gold.

Provisions of the agreement, material to the issues presented by the appeal, are:

"The Lessee agrees to pay over unto the Lessors ten per cent (10%) gross royalty on any and all recoveries made from the mining operations and dredging operations on said premises, * * *.

"The Lessee agrees, immediately after each clean-up, to deliver the clean-up to the United States National Bank of Portland, Medford Branch, said clean-up to be shipped by said Bank to the United States Mint. * * *

"The remaining ninety per cent (90%) of the gross royalty shall be paid over by the said Bank to the Southern Oregon Mining Company, Lessee herein.

"In addition to the above royalties, the Lessee agrees to pay unto the Lessors the sum of $20.00 per acre as damages for any hay land mined during the year 1941, it being the intention of the parties hereto to reimburse the Lessors for loss of crop which would otherwise have been produced on the land so mined or dredged.

"Lessee agrees to maintain all fences that are now on said premises, * * *.

* * *

"Lessee agrees not to change the ditch head locations now on said premises without the permission of the Lessors.

"Lessee agrees to leave a channel on said premises, which shall be approximately straight, for the purpose of drainage, the location and direction of said channel to be agreed upon by the parties heretofore before or during the mining and dredging operations.

"Lessee agrees to reclaim any part of the above described property which is now considered agricultural land, seasonally, but in all events within six months, first by levelling the tailings, and then by redistributing any top soil previously set aside for that purpose by the Lessee. Tailings on all ground

not agricultural shall be smoothed down by the Lessee.

"Lessee further agrees to burn or bury all slashings or brush and/or trees which may have been uprooted or cut by the Lessee in said mining operations.

\* \* \*

"Lessee agrees to furnish a good and sufficient bond to the Lessors to insure the faithful performance of this contract by the Lessee, in an amount not exceeding the sum of $3,500.00, if and when required by the Lessors."

The complaint, after averring the respondents' ownership of the aforementioned property, alleged that the appellant, shortly after signing the lease, proceeded to mine the property and that it completed the work in February, 1942. It charged that the appellant failed: To account for the gold taken from the property; to level the soil; to reclaim the agricultural land; to remove the rocks brought to the surface by the mining operations; to put back the topsoil; to reinstall the light and telephone service; to remove dirt from the irrigation ditches placed in them by the appellant; to restore the fences; to burn or remove brush, logs and stumps; to make the creek channel straight; to level the tailings; and to furnish the plaintiffs with the bond mentioned in the lease. The complaint alleged that in order to level the land and restore the topsoil, "heavy equipment and machinery is required" and that, although the appellant possessed such equipment, the respondents had none and could not obtain any. The averments continue as follows:

"* * * the reasonable cost of such said leveling, restoration, resoiling and repairing, as herein above set out, exclusive of the accounting for such said gold, would be and is in the sum of not less

than Fifteen Hundred Dollars ($1,500.00) and that by reason of failure of the defendant to do such leveling, * * * the plaintiffs have been deprived of the use thereof for a period of one year and will be deprived of the use thereof for at least another crop year, all to their additional damage in the sum of One Thousand Dollars ($1,000.00)."

The complaint alleges that the respondents do not know how much gold the appellant recovered from the property and, continuing, avers:

"The plaintiffs are entitled to a decree of this said court that the defendant should be required to specifically comply and perform all the terms, conditions and provisions of said contract and to do such leveling, repairing, restoration and resoiling * * * and that the defendant be required to account for such said gold as required of it" by the lease.

The paragraph from which we just quoted alleges that in the event the court does not order specific performance, the respondents are entitled to judgment against the appellant (1) in the sum of $1,500, "the same being the reasonable cost of such leveling"; (2) in the further sum of $1,000 for the loss of the use of the premises; and (3) in whatever additional sum the court finds is due the respondents for gold recovered and for which no accounting has been made. The prayer of the complaint sought a decree for the specific performance of the covenants of the lease. Particularly, it sought an order requiring the appellant (a) to level, restore and resoil the property, and (b) to account for the gold the appellant took from the property. It asked for judgment (1) in the amount of $1,500, in the event that a decree for specific performance was not granted; (2) for an additional award of $1,000 for the loss of the use of the premises; and (3) for the

additional amount that represented the value of the gold for which the appellant had not accounted.

The answer admitted that the appellant, after signing the lease, proceeded to mine the property; that it did not burn all of the brush and stumps uprooted by the mining operations; that it did not furnish the respondents with the bond mentioned in the lease; that it did not restore the light and telephone equipment upon the property; and that the appellant possessed the heavy equipment and machinery necessary to perform the work which, the complaint charges, the appellant neglected. The answer averred that the appellant had made arrangements whereby the light and telephone service would be restored; that it omitted the destruction of the brush and stumps upon the respondents' request; that "plaintiffs waived all the provisions of said lease requiring the defendant to post said bond"; and that the use of its heavy equipment was subject to government restrictions.

The respondents own a tract of land, 300 acres in extent, upon which there stand three houses and other buildings. A stream which flows through the property renders it practical to mine, through the use of a dredge, the parts of the property near the stream. About 30 acres of the tract are agricultural, and the stream, together with the respondents' water rights and irrigation ditches, afford ample water for the property. Adjacent to the stream are two fields which the witnesses mentioned frequently. One of these, known as the upper field, was about two acres in extent prior to the mining operations. The other, or lower field, contained approximately 3.2 acres before the appellant mined the property. The soil of each was of excellent quality and varied in depth from three to six feet. Hay, grain and garden truck were grown

in those areas. The soil produced three tons of hay per acre, which brought $20 to $25 per ton, and when seeded to grain yielded 25 to 35 bushels. The appellant's operations kept those areas out of production for two years. The market value of the land in the fields was $200 to $300 per acre. Under the topsoil of the two fields was gravel containing gold which the appellant wished to recover. The appellant mined both of these areas. The creek bed, as well as other parts of the respondents' property, was also made up of gold-bearing gravel. In the latter were many large boulders and rocks. Adjacent to the stream at places were growths of brush and trees. In the course of the mining operations the brush and trees were uprooted and were thrown to the side.

In dredger mining the topsoil of agricultural areas is shoved far to the side where it will be out of reach of the dredge when it enters the area. The purpose is two-fold: to expose the gold-bearing gravel, and to save the topsoil so that it can be returned to the area when the mining has been completed. When the dredging machinery has recovered the gold from the gravel, the latter is dumped into the places from which it was taken and assumes the form of mounds or hummocks. The witnesses referred to the latter as tailings. Before the topsoil is spread out over the tailings a bulldozer levels the mounds and then shoves the soil back upon the leveled gravel. In that way the ground is again rendered suitable for agricultural purposes.

A witness, whose testimony was not contradicted, swore that in places where the topsoil was four to six feet deep the appellant removed only the upper two and one-half feet and ran the remainder through the dredge or shoved it into the stream. Thus, it

saved an insufficient amount of soil for the eventual restoration work. In some places the appellant failed to shove back into position all of the topsoil and left some of it in the piles which were formed when the ground was being prepared for mining.

The lower field, previously mentioned, which, prior to the mining, was about 3.2 acres in extent, contained only 1.81 acres of agricultural land after the appellant quit the property. The upper field, which, prior to the appellant's operations, contained two acres of good soil, after the mining was 524 square feet short of its previous area. Both fields, besides being smaller, lacked deep soil and some large boulders were lodged near the surface. In addition to these two fields, two other areas, large in size, produced crops before the appellant mined the property. After the appellant had mined both of these areas they consisted of nothing but gravel bars. The surface of the latter was not smoothed but was left in the form of humps and ridges. Here and there deep holes remained.

By reverting to the lease quoted in a preceding paragraph, it will be seen that the appellant agreed "to leave a channel on said premises, which shall be approximately straight." The reference was to the channel of the stream which we have already mentioned. After the appellant had completed its work the new channel had "two pronounced turns." The quoted words were taken from the testimony of John D. Bowdish, vice-president of the appellant, who testified on its behalf. He swore that he made the turns upon the respondents' request. The respondents refuted his testimony and testified that they did not wish any turns in the channel. They claimed that they requested Bowdish to keep the channel straight. According to the evidence, the turns force the water in the rainy

season over the stream's banks and cause the soil to be washed away. The fact that the mining operations destroyed the roots of the brush and trees that previously grew upon the slopes of the stream leaves the banks at the "two pronounced turns" in a dangerous condition, according to the evidence.

One of the fences which previously was upon the property was not rebuilt after it was torn down by the appellant's crew. The irrigation ditch, as Bowdish conceded, was filled with dirt at places, and considerable labor will be required to restore it to usefulness. The headgate, or intake, of the ditch was destroyed by the appellant's operations and was not rebuilt. At places brush, stumps and logs were left upon the property. In the course of its operations the appellant took down the poles upon which were strung the electric and telephone wires which served the respondents' homes. The restoration of this work is still neglected. As the appellant's operations were drawing to a close, the respondents began to suspect that the requirements of the lease would be left incomplete and demanded, in writing, that the appellant furnish them with the bond mentioned in the lease. Mr. Bowdish swore that after the demand was made it was withdrawn. His testimony was refuted. It is our belief that the demand was neither withdrawn nor waived. The bond has not been furnished.

The appellant never gave the respondents any kind of statement showing the amount of gold taken from their property. The respondents, so far as the record discloses, have no knowledge of the quantity of gold recovered in the mining operations.

The evidence indicates that heavy power-driven machinery is necessary to level the banks of gravel

and that similar machinery is also necessary to return the topsoil to its original position. Mr. Bowdish testified:

"Well, we are ready to move that tree, and move anything else we can find out needs to be moved, that is within the scope of that contract. We still have our equipment; we are still located here."

The machinery, however, was not returned to the property. The cost of leveling the gravel banks, of restoring the topsoil, and of sinking large boulders which are near the surface, if done by hand or horse-driven equipment, would be more than the value of the acreage.

The appellant's brief states:

"This is a case in which it is apparent that a mountain is attempted to be made out of a mole hill. There is no evidence in the case which would justify a court in finding a judgment of $1,700.00."

The record seems to indicate that the trial judge viewed the property. At any rate, he was in a better position than are we to make an accurate appraisal of the evidence. The argument just quoted concedes, as is evident, that some damage was inflicted upon the property. Without reviewing the evidence further, we express our belief that the appellant failed in many details to comply with the provisions of its agreement, and that its breaches of the agreement were substantial.

The foregoing will suffice as a review of the pleadings and of the evidence.

The first assignment of error is:

"The plaintiffs' complaint fails to state facts sufficient to constitute a suit in equity and a court of equity is without jurisdiction of the cause."

We shall now determine whether the circuit court, sitting as a court of equity, had jurisdiction over the cause and, next, whether the complaint stated a cause of suit.

■ This court has several times held that jurisdiction over a cause depends primarily upon the averments of the complaint: *Watts v. Gerking,* 111 Or. 641, 222 P. 318, 228 P. 135, 34 A. L. R. 1489; *Dippold v. Cathlamet Timber Co.,* 98 Or. 183, 193 P. 909; *Hodler v. Hodler,* 95 Or. 180, 185 P. 241, 187 P. 604; *Eagle Cliff Fishing Co. v. McGowan,* 70 Or. 1, 137 P. 766; and see generally 21 C. J. S., Courts, § 33, p. 42.

We, therefore, go on to the question as to whether or not the complaint averred sufficient facts to have authorized a court of equity to entertain this suit. No challenge was presented in the circuit court to its jurisdiction. The complaint was accepted in that tribunal as sufficient to confer jurisdiction upon a court of equity. The pleading was unchallenged by motion, demurrer or objection to the introduction of evidence. We observe from the transcript that the respondents' counsel repeatedly made it clear that he interpreted the complaint as one which sought equitable relief. For instance, in the course of his opening statement, he declared:

"We brought this suit for the purpose of having specific performance of this contract and an accounting for the gold * * *."

During the reception of the evidence he said:

"We are asking only for specific performance of the contract. If they don't do that, then we are entitled to damages."

At another time he declared:

"If the Court can specifically order this contract to be performed then it will be proper, unless

they do within a certain length of time they will be required to do it or a judgment be given against them.''

The interpretations of the complaint thus voiced brought no rejoinder from the appellant.

It is evident from the complaint that the primary relief sought was a decree requiring the appellant to perform the covenants of the lease agreement. Damages were demanded as an alternative, but only as an alternative. They were sought in the event that specific performance was not ordered. The complaint also sought an accounting, but not as the primary relief for which the suit was instituted.

The instrument signed by the parties March 13, 1941, contained covenants in addition to those which leased the premises. For instance, it imposed upon the appellant the duty to perform construction work including the building of a channel for the stream, the rebuilding of fences, the restoration of the soil and the leveling of the tailings. It also required the appellant to furnish a surety bond in the event the respondents requested one.

■ Generally, specific performance will not be ordered of a construction contract: *Cartwright v. Oregon Electric Co.*, 88 Or. 596, 171 P. 1055; *Oregonian Railway Co. v. Oregon Railway & Navigation Co.*, 37 Fed. 733; and Williston on Contracts, Rev. Ed., § 1423. The reasons commonly given for not ordering the performance in specie of such contracts are (a) damages are adequate; (b) a court of equity is not equipped to supervise work which requies a continuous series of acts over an extended period; and (c) such contracts frequently are not expressed with sufficient detail to render the award of specific performance practical. But the

withholding of specific performance as a remedy is by no means universal. As was said by Mr. Justice Holmes, in the much-cited case of *Jones v. Parker,* 163 Mass. 564, 40 N. E. 1044, 47 Am. St. Rep. 487:

> "There is no universal rule that courts of equity never will enforce a contract which requires some building to be done."

He added:

> "They have enforced such contracts from the earliest days to the present time."

In that case, specific performance was ordered of an agreement which required the defendant to do some construction work. The instrument containing the covenant which the defendant was directed to perform was a lease covering part of a building then under construction. The lease required him to deliver possession of the part to the lessee (plaintiff) upon completion of the structure, and further "during the term of this lease, reasonably to heat and light the demised premises." The complaint averred that the defendant refused to construct the apparatus which was needed to light and heat the premises. In reversing the order of the lower court, which sustained a demurrer to the complaint, the opinion, written by Mr. Justice Holmes, found that the provision, "reasonably to heat and light the demised premises", was not uncertain in meaning and that a court of equity was able to supervise the needed construction work. In The Progress of the Law—Equity, written by Dean Roscoe Pound, 33 Harv. L. Rev. 420, the decision just mentioned is cited and, concerning it, Dean Pound says:

> "That characteristically sensible and liberal decision is not the least of the many contributions of Mr. Justice Holmes to our law. A question similar to that in Jones v. Parker was involved in New York

> R. Co. v. Stoneman, where a tenant sued for specific performance of the landlord's covenant that 'the demised premises shall be heated by the lessors to a proper warmth for office purposes.' A ruling that the bill could not be maintained was reversed."

For a citation to a score or so of decisions rendered in construction contract cases which are in accord with Jones v. Parker, see footnote (3) to § 1423, Williston on Contracts, Rev. Ed. The authority just mentioned in § 1423 says:

> "But where the inadequacy of damages is great, and the difficulties not extreme, specific performance will be granted and the tendency in modern times has been increasingly towards granting relief, where under the particular circumstances of the cases damages are not an adequate remedy."

Continuing, the section from which we just quoted, says:

> "The modern test is whether the difficulties of supervision outweigh the importance of granting specific performance because of the inadequacy of damages."

In *Gregory v. Ingwersen,* 32 N. J. Eq. 199, the court granted specific performance of an agreement by the defendant to construct a staircase between two buildings, one of which was owned by the plaintiff and the other by the defendant. The consideration for the agreement was a conveyance by the plaintiff to the defendant of a strip of land lying between the two buildings. The defendant built a staircase but it did not afford access to the plaintiff's property. The decision said:

> "Though the defendant may, and probably will, be put to considerable expense in altering the stairways so as to make them conform to the requirements of the contract, that consideration will not

avail to prevent the court from compelling a performance of the contract. The complainant has no adequate remedy at law. The covenant was part of the consideration of the conveyance of the strip to the defendant. Equity will enforce building contracts under such circumstances as this case presents.''

In *Wolverhampton v. Emmons,* 1 Q. B. (Eng.) 515, 6 B. R. C. 900, the court awarded performance in specie of an agreement on the defendant's part to erect eight houses. The plans and specifications contained the needed details. From the decision of the Master of the Rolls, we quote:

"The authorities to which reference has been made appear to me to show that, where there is a definite contract by which a person who has acquired land in consideration thereof has agreed to erect on the land so acquired a building, of which the particulars are clearly specified, and the erection of which is of an importance to the other party which cannot adequately be measured by pecuniary damages, that is a case in which, according to the doctrine acted upon by Courts of Equity in relation to such matters, specific performance ought to be ordered. If a man has contracted to build a house on a piece of land according to certain detailed plans, and has obtained a conveyance of the land on the terms that he will do so, why should he be allowed to turn around and refuse to perform that contract, especially where damages will not compensate the person with whom he has contracted.''

The report of this decision in the aforementioned volume of British Ruling Cases is followed with an extensive compilation of decisions entered in other construction contract cases.

An instance from this court ordering the performance in specie of a construction contract is *Rector of*

*St. David's v. Wood,* 24 Or. 396, 34 P. 18, 41 Am. St. Rep. 860. The defendant in that case had contracted to furnish from his quarry in Benton County all the stone needed for the construction of a church which the plaintiff was erecting in Portland. The agreement bound him to cut, dress, transport and lay the stone in the walls of the building. He also agreed to provide whatever material and masonry work were necessary. After he had completed approximately two-thirds of the walls, he abandoned his undertaking. In affirming the decree of the circuit court, which ordered the defendant to complete the work, the decision of this court pointed out that, since the stone obtained from the defendant's quarry was of a kind and color which could not be matched by the stone from other quarries, the appearance of the plaintiff's building would be marred unless the defendant supplied stone for the completion of the walls.

In the recent decision, entitled *Temple Enterprises, Inc., v. Combs,* 164 Or. 133, 100 P. (2d) 613, 128 A. L. R. 856, Mr. Justice LUSK embraced the well known equitable principle that "whenever a contract concerning real property is, in its nature and incidence entirely unobjectionable—that is, when it possesses none of those features which appeal to the discretion of the court—it is as much a matter of course for a court of equity to decree a specific performance of it as it is for a court of law to give damages for the breach of it." The statement continued: "A lease, being a conveyance of an interest in land, there would seem to be no good reason for withholding application of this rule to a contract of that character. Specific performance of a lease was approved by this court in *Wallace v. Scoggins,* 17 Or. 476, 21 P. 558." As already indicated, the decision took note of the fact that the grant of

specific performance is discretionary. It held that specific performance was the proper remedy "because the plaintiff's damages would be difficult of ascertainment, and that remedy would not, therefore, be as complete and adequate to accomplish the ends of justice as the remedy of specific performance."

The principles of equity jurisprudence just reviewed render it clear, in our opinion, that the complaint conferred jurisdiction upon the circuit court, sitting as a court of equity. We do not mean to say that the court would be compelled, if the averments of the complaint were substantiated by proof, to grant the remedy of specific performance. The granting or the withholding of performance in specie is subject to the discretionary power of the chancellor. We mean that the averments of the complaint were sufficient to challenge the jurisdiction of a court of equity and that in that manner jurisdiction was conferred over this cause. The first contention made by the assignment of error under consideration is, therefore, in our opinion, lacking in merit.

The other phase of the assignment of error under consideration contends that the complaint failed to state facts sufficient to constitute a suit in equity.

The requirement that a pleading must state a cause which entitles the pleader to relief is, of course, fundamental. The failure of a complaint to meet that basic requirement may be presented, as the appellant argues, for the first time on appeal. In fact, the objection is self-assertive. But, as has been held hundreds of times, attacks upon complaints diminish in potency the longer they are postponed. If the objection is voiced for the first time in the appellate court, a complaint, however defectively it may phrase a cause, can

turn aside the best worded attack. It is vulnerable to a postponed attack only if it wholly fails to state a cause of suit or of action, as the case may be. When the attack is tardy, everything inferable from the language actually used is deemed pleaded.

■ The authorities which we have already reviewed indicate that the averments of the complaint were sufficient for a suit entitling the respondents to the specific performance of the construction covenants of the lease agreement. Nothing appeared in the complaint denoting that it would be difficult for a court of equity to oversee the performance of the agreement. From all that appeared, the construction work that remained to be done was simple and its details were recited with sufficient clarity in the lease agreement.

■ The other phase of relief sought by the prayer was for an accounting of the gold recovered from the leased premises. The only attack made upon the part of the complaint which sought the accounting is thus expressed in the appellant's brief:

"Nowhere in the complaint was it alleged that the appellant had mined any gold. * * * It is nowhere alleged that the defendant refused to make any accounting or that any demand had been made therefor, or that any gold was mined from said premises, or that an accounting, if necessary, was at all complicated."

The complaint, as already said, avers that the appellant, shortly after March 13, 1941, went into possession of the property "and proceeded to mine the same," and "on or about February, 1942, completed said mining operations." It also avers that the appellant "failed to account for all the gold which it has removed and mined from said premises, * * *." Continuing, the

pleading says: "The plaintiffs cannot specify the amount of gold mined from said premises for which the defendant has not accounted." We believe that, in the absence of a motion for more particulars, the quoted language states that the appellant mined the respondents' property and recovered gold from it for which it has not accounted.

Generally, in suits for an accounting, the complaint must aver that the plaintiff demanded an accounting of the defendant and that the latter refused to give one: *Heidel v. Shute,* 86 Or. 210, 167 P. 586, 168 P. 298; *Haaland v. Miller,* 67 Or. 346, 136 P. 9; and see *French v. C. F. & T. Co.,* 124 Or. 686, 265 P. 443. But a demand and a refusal are not necessary if the desired accounting will be merely ancillary to the main purposes of the suit: Pomeroy's Equity Jurisprudence, 5th ed., § 1420; 1 C. J. S., Accounting, § 28, p. 660; and decisions collated in 143 A. L. R. 1216. The accounting, in our opinion, was ancillary to the relief which the respondents sought. Their main purpose was to secure the specific performance of the contract and an award of compensation for the use of their land in the period in which the defendant wrongfully withheld possession. The respondents were entitled to their share of all gold which the appellant recovered from the property. The accounting was ancillary to that right. The failure to aver a demand and a refusal did not render the complaint defective.

We express our belief that the first assignment of error lacks merit.

The second assignment of error follows:

"A court of equity is without power or jurisdiction to grant specific performance under any or all of the allegations of the complaint herein."

From what we said in the preceding paragraphs, it follows that, in our belief, the assignment of error just quoted is without merit.

■ The third assignment of error follows:

"A court of equity is without power or jurisdiction to grant a decree for damages under the allegations of the complaint herein."

It was entirely proper for the respondents to aver damages as a secondary form of the relief which they sought: Pomeroy's Equity Jurisprudence, 5th ed., § 1410. This assignment of error lacks merit.

■ The fourth assignment of error says:

"At the conclusion of the hearing of this cause in the trial court, it was the duty of the trial court to dismiss the cause upon the ground that it appeared from the proofs that a court of equity was without jurisdiction in the cause."

The evidence showed, in our opinion, that the appellant left many details of its work unperformed and that in order to complete the work, equipment of a heavy and unusual kind was necessary. Near the respondents' property the appellant had machinery which could readily complete the work. The respondents, however, lacked such equipment. The incomplete work was clearly defined and outlined by the evidence, and a court of equity, in our opinion, would have experienced no difficulty in overseeing the performance of the work. The neglected work, according to the uncontradicted evidence, affected the value of the entire ranch and in that manner made the measurement of damages difficult. The imperfect channel dug by the appellant will cause erosion of soil to take place at times of high water. There is no claim that the contract was unfair or unjust. The evidence wholly fails to indicate that

the specific performance awarded by the interlocutory decree was oppressive, unconscionable or attended with hardship. We are satisfied that the record shows that damages as a remedy are inferior to the award of specific performance which was made by the interlocutory decree. The interlocutory decree, according to the authorities reviewed in preceding paragraphs, was fully warranted. Such being our belief, the fourth assignment of error lacks merit.

■ The fifth assignment of error follows:

"The trial court erred in entering judgment against the appellant in favor of respondents for damages as a court of equity had no jurisdiction to enter such judgment."

Had the circuit court made the interlocutory decree final it could have enforced compliance with it by any appropriate process, such as an attachment for contempt. Seemingly, for the purpose of avoiding the troubles attendant upon such a course, the respondents elected to accept an award of damages and waived performance in specie. That was done after the appellant had refused to comply with the interlocutory decree. We know of no reason which rendered their election improper, or prejudicial to the appellant. See Pomeroy's Equity Jurisprudence, 5th ed., § 1410.

■ The sixth assignment of error reads as follows:

"The trial court erred in entering the judgment against the appellant in favor of the respondents as there was no evidence or testimony that would sustain such judgment."

We have already mentioned much of the evidence that indicates the amount of damages which resulted from the appellant's incomplete performance of its agree-

ment. To none of it was any substantial objection made. In our opinion, the award was justified. We dismiss this assignment of error as lacking in merit.

The seventh assignment of error follows:

"The trial court erred in not dismissing the cause." From what we have already said, it necessarily follows that, in our opinion, no error was committed in not dismissing the cause.

The foregoing disposes of all of the assignments of error. We have carefully considered every contention presented by the appellant and, although we have not mentioned all of the authorities cited in its brief, all of them have received careful consideration.

The decree of the circuit court is affirmed.

Petition for rehearing denied September 11, 1945

## ON PETITION FOR REHEARING
### (161 P. (2d) 786)

ROSSMAN, J.

A petition for a rehearing filed by the appellant is based solely upon the proposition that "judgment in the sum of $1,500.00 for damages and the sum of $200.00 for loss of crops, is entirely too excessive." Seemingly, the appellant believes that the only injury shown by the evidence is the loss of crops and the shortages in the areas of the respondents' two fields: 1.39 acres in the lower field and 524 square feet in the upper field. Our previous decision mentioned the appellant's contention that the awarded recovery was excessive.

Contrary to the appellant's contention, the injury to the respondents' property resulting from the appellant's failure to complete its undertaking was not confined to the loss of crops and the shortages in the areas

of the two fields. The following are some additional items of injury shown by the evidence: (1) The appellant's operations filled parts of the irrigation ditches with dirt and refuse which the appellant failed to remove; (2) the headgate of the irrigation system was destroyed by the appellant; (3) large boulders were left near the surface of the fields; (4) the power service lines were not restored; (5) the appellant left in the form of gravel beds large areas that previously were covered with soil and produced crops; (6) the channel of the stream now has two sharp bends which will cause erosion; (7) trees and stumps, uprooted by the appellant's operations, were neither destroyed nor removed by the appellant; (8) the gravel beds created by the appellant's operations contain many deep pits which menace the operation of farming equipment; (9) crops were lost; and (10) fences were not rebuilt.

In our opinion, the awarded damages are not excessive. The petition for a rehearing is denied.